# ORR *v.* ORR

No. 77–1119.   Argued November 27, 1978—Decided March 5, 1979

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. BLACKMUN,

J., *post*, p. 284, and STEVENS, J., *post*, p. 284, filed concurring opinions. POWELL, J., filed a dissenting opinion, *post*, p. 285. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 290.

*John L. Capell III* argued the cause and filed briefs for appellant.

*W. F. Horsley* argued the cause and filed a brief for appellee.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question presented is the constitutionality of Alabama alimony statutes which provide that husbands, but not wives, may be required to pay alimony upon divorce.[1]

On February 26, 1974, a final decree of divorce was entered, dissolving the marriage of William and Lillian Orr. That decree directed appellant, Mr. Orr, to pay appellee, Mrs. Orr, $1,240 per month in alimony. On July 28, 1976, Mrs. Orr

*Ruth Bader Ginsburg* and *Margaret Moses Young* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

[1] The statutes, Ala. Code, Tit. 30 (1975), provide that:

"§ 30-2-51. . . . If the wife has no separate estate or if it be insufficient for her maintenance, the judge, upon granting a divorce, at his discretion, may order to the wife an allowance out of the estate of the husband, taking into consideration the value thereof and the condition of his family.

"§ 30-2-52. . . . If the divorce is in favor of the wife for the misconduct of the husband, the judge trying the case shall have the right to make an allowance to the wife out of the husband's estate, or not make her an allowance as the circumstances of the case may justify, and if an allowance is made, it must be as liberal as the estate of the husband will permit, regard being had to the condition of his family and to all the circumstances of the case.

"§ 30-2-53. . . . If the divorce is in favor of the husband for the misconduct of the wife and if the judge in his discretion deems the wife entitled to an allowance, the allowance must be regulated by the ability of the husband and the nature of the misconduct of the wife."

The Alabama Supreme Court has held that "there is no authority in this state for awarding alimony against the wife in favor of the husband. . . . The statutory scheme is to provide alimony only in favor of the wife." *Davis* v. *Davis,* 279 Ala. 643, 644, 189 So. 2d 158, 160 (1966).

initiated a contempt proceeding in the Circuit Court of Lee County, Ala., alleging that Mr. Orr was in arrears in his alimony payments. On August 19, 1976, at the hearing on Mrs. Orr's petition, Mr. Orr submitted in his defense a motion requesting that Alabama's alimony statutes be declared unconstitutional because they authorize courts to place an obligation of alimony upon husbands but never upon wives. The Circuit Court denied Mr. Orr's motion and entered judgment against him for $5,524, covering back alimony and attorney fees. Relying solely upon his federal constitutional claim, Mr. Orr appealed the judgment. On March 16, 1977, the Court of Civil Appeals of Alabama sustained the constitutionality of the Alabama statutes, 351 So. 2d 904. On May 24, the Supreme Court of Alabama granted Mr. Orr's petition for a writ of certiorari, but on November 10, without court opinion, quashed the writ as improvidently granted. 351 So. 2d 906. We noted probable jurisdiction, 436 U. S. 924 (1978). We now hold the challenged Alabama statutes unconstitutional and reverse.

I

We first address three preliminary questions not raised by the parties or the Alabama courts below, but which nevertheless may be jurisdictional and therefore are considered of our own motion.

The first concerns the standing of Mr. Orr to assert in his defense the unconstitutionality of the Alabama statutes. It appears that Mr. Orr made no claim that he was entitled to an award of alimony from Mrs. Orr, but only that he should not be required to pay alimony if similarly situated wives could not be ordered to pay.[2] It is therefore possible that his

---

[2] There is some uncertainty on this point. It may be that appellant's Circuit Court motion challenging the constitutionality of the statutes could be construed as constituting a claim for alimony. The Appeals Court opinion refers to one of Mr. Orr's arguments as challenging the failure of the statutes to "provide for an award of alimony to . . . males . . . ," 351

success here will not ultimately bring him relief from the judgment outstanding against him, as the State could respond to a reversal by neutrally extending alimony rights to needy husbands as well as wives. In that event, Mr. Orr would remain obligated to his wife. It is thus argued that the only "proper plaintiff" would be a husband who requested alimony for himself, and not one who merely objected to paying alimony.

This argument quite clearly proves too much. In every equal protection attack upon a statute challenged as under-inclusive, the State may satisfy the Constitution's commands either by extending benefits to the previously disfavored class or by denying benefits to both parties (*e. g.,* by repealing the statute as a whole). In this case, if held unconstitutional, the Alabama divorce statutes could be validated by, *inter alia,* amendments which either (1) permit awards to husbands as well as wives, or (2) deny alimony to both parties. It is true that under the first disposition Mr. Orr might gain nothing from his success in this Court, although the hypothetical "requesting" plaintiff would. However, if instead the State takes the second course and denies alimony to both spouses, it is Mr. Orr and not the hypothetical plaintiff who would benefit. Because we have no way of knowing how the State will in fact respond, unless we are to hold that underinclusive statutes can never be challenged because *any* plaintiff's success can theoretically be thwarted, Mr. Orr must be held to have standing here. We have on several occasions considered this inherent problem of challenges to underinclusive statutes, *Stanton* v. *Stanton,* 421 U. S. 7, 17 (1975); *Craig* v. *Boren,* 429 U. S. 190, 210 n. 24 (1976), and have not denied a plaintiff standing on this ground.

---

So. 2d 904, 905 (1977), and, in oral argument, appellant's attorney characterized his motion as asserting a claim to such an award. Tr. of Oral Arg. 7–8. Of course, whether or not this was the proper way to assert a claim for alimony may be a question of state law, but the state courts did not challenge appellant's standing on this or any other ground.

There is no question but that Mr. Orr bears a burden he would not bear were he female. The issue is highlighted, although not altered, by transposing it to the sphere of race. There is no doubt that a state law imposing alimony obligations on blacks but not whites could be challenged by a black who was required to pay. The burden alone is sufficient to establish standing. Our resolution of a statute's constitutionality often does "not finally resolve the controversy as between th[e] appellant and th[e] appellee," *Stanton* v. *Stanton,* 421 U. S., at 17. We do not deny standing simply because the "appellant, although prevailing here on the federal constitutional issue, may or may not ultimately win [his] lawsuit." *Id.,* at 18. The holdings of the Alabama courts stand as a total bar to appellant's relief; his constitutional attack holds the only promise of escape from the burden that derives from the challenged statutes. He has therefore "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which th[is] court so largely depends for illumination of difficult constitutional questions," *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 616 (1973), quoting *Baker* v. *Carr,* 369 U. S. 186, 204 (1962). Indeed, on indistinguishable facts, this Court has stated that a party's standing will be sustained. In *Linda R. S.* v. *Richard D., supra,* at 619 n. 5 (MARSHALL, J.), we stated that the parent of a legitimate child who must by statute pay child support has standing to challenge the statute on the ground that the parent of an illegitimate child is not equally burdened.[3]

---

[3] Careful examination of appellant's allegations reveals that he may not need to rely upon these arguments to demonstrate his standing, for he alleges that he will receive some relief no matter which gender-neutral reform of the statutes Alabama chooses to make. Even if Alabama chooses to burden both men and women with alimony requirements in appropriate circumstances, Mr. Orr argues that a gender-neutral statute would result in lower payments on his part. He argues that the current statutes award alimony to wives based not solely upon need or comparative financial cir-

A second preliminary question concerns the timeliness of appellant's challenge to the constitutionality of the statutes. No constitutional challenge was made at the time of the original divorce decree; Mr. Orr did not interpose the Constitution until his ex-wife sought a contempt judgment against him for his failure to abide by the terms of the decree. This unexcused tardiness might well have constituted a procedural default under state law, and if Alabama had refused to hear Mr. Orr's constitutional objection on that ground, we might have been without jurisdiction to consider it here. See C. Wright, Federal Courts 541–542 (3d ed. 1976).

But in this case neither Mrs. Orr nor the Alabama courts at any time objected to the timeliness of the presentation of the constitutional issue. Instead, the Alabama Circuit and Civil Appeals Courts both considered the issue to be properly presented and decided it on the merits. See 351 So. 2d, at 905; App. to Juris. Statement 22a. In such circumstances, the objection that Mr. Orr's complaint " 'comes too late' . . . is clearly untenable. . . . [S]ince the state court deemed the federal constitutional question to be before it, we could not treat the decision below as resting upon an adequate and independent state ground even if we were to conclude that the state court might properly have relied upon such a ground to avoid deciding the federal question." *Beecher* v. *Alabama*, 389 U. S. 35, 37 n. 3 (1967). This is merely an application of the "elementary rule that it is irrelevant to inquire . . . when a Federal question was raised in a court

cumstances, but also upon gender-related factors—*e. g.*, the State's view that a man must maintain his wife in the manner to which she has been accustomed, *Ortman* v. *Ortman*, 203 Ala. 167, 82 So. 417 (1919). He also argues that alimony agreements are not automatically incorporated into court decrees, but rather are usually first reviewed as to their fairness to the wife, but not to the husband, see *Russell* v. *Russell*, 247 Ala. 284, 286, 24 So. 2d 124, 126 (1945). Given our disposition of the case, we need not resolve these allegations, but they serve to render unassailable appellant's standing to assert the unconstitutionality of the statutes.

below when it appears that such question was actually considered and decided." *Manhattan Life Ins. Co.* v. *Cohen*, 234 U. S. 123, 134 (1914). Accord, *Harlin* v. *Missouri*, 439 U. S. 459 (1979); *Jenkins* v. *Georgia*, 418 U. S. 153, 157 (1974); *Raley* v. *Ohio*, 360 U. S. 423, 436 (1959). See C. Wright, *supra*, at 542.[4]

The third preliminary question arises from indications in the record that Mr. Orr's alimony obligation was part of a stipulation entered into by the parties, which was then incorporated into the divorce decree by the Lee County Circuit Court. Thus, it may be that despite the unconstitutionality of the alimony statutes, Mr. Orr may have a continuing obligation to his former wife based upon that agreement—in essence a matter of state contract law.[5] If the Alabama

---

[4] This does not preclude any other State, or even Alabama in another case, from holding that contempt proceedings are too late in the process to challenge the constitutionality of a divorce decree already entered without constitutional objection—assuming, of course, that the State's prior proceedings permit fair opportunity to assert the federal right, see *NAACP* v. *Alabama*, 377 U. S. 288 (1964). Indeed, as our Brother POWELL points out, *post*, at 286, Alabama apparently has a similar rule. See *Hughes* v. *Hughes*, 362 So. 2d 910 (Ala. Civ. App.), cert. dismissed as improvidently granted, 362 So. 2d 918 (Ala. 1978), appeal docketed, No. 78–1071. There is, therefore, no reason for concern that today's decision might nullify existing alimony obligations. But the fact that state courts *can* decline to hear such tardily raised constitutional challenges does not mean that as a matter of federal law they *must* do so. And where they decide instead to reach the federal question, this Court has jurisdiction. See *Beecher* v. *Alabama*, 389 U. S. 35, 37 n. 3 (1967), and cases cited in text, *supra*, this page.

[5] Whether Mrs. Orr's contempt judgment would survive on the basis of the stipulation alone depends upon the resolution of somewhat knotty state-law problems. The foremost of these is the fact that the present suit is not a simple action for breach of contract, but rather a contempt proceeding for disobeying the court's divorce decree. Moreover, under Alabama law, the divorce court judge does not automatically approve stipulated settlements, but must review them for fairness. *Russell* v. *Russell, supra*. How the Alabama courts would treat Mr. Orr's stipulation

courts had so held, and had anchored their judgments in this case on that basis, an independent and adequate state ground might exist and we would be without power to hear the constitutional argument. See *Herb* v. *Pitcairn,* 324 U. S. 117, 125–126 (1945); *Fox Film Corp.* v. *Muller,* 296 U. S. 207 (1935). And if there were ambiguity as to whether the State's decision was based on federal or state grounds, it would be open to this Court not to determine the federal question, but to remand to the state courts for clarification as to the ground of the decision. See *California* v. *Krivda,* 409 U. S. 33 (1972).

But there is no ambiguity here. At no time did Mrs. Orr raise the stipulation as a possible alternative ground in support of her judgment. Indeed, her brief in the Alabama Court of Civil Appeals expressly stated that "[t]he appellee agrees that the issue before this Court is whether the Alabama alimony laws are unconstitutional because of the gender based classification made in the statutes." App. to Juris. Statement 25a. The Alabama Circuit and Civil Appeals Courts reached and decided the federal question without considering any state-law issues, the latter specifying that "[t]he sole issue before this court is whether Alabama's alimony statutes are unconstitutional. We find they are not unconstitutional and affirm." 351 So. 2d, at 905. While no reason was given by the State Supreme Court's majority for quashing the writ of certiorari, the concurring and dissenting opinions mention only the federal constitutional issue and do not mention the stipulation. See 351 So. 2d, at 906–910. And Mrs. Orr did not even raise the point in this Court. On this record, then, our course is clear and dictated by a long line of decisions.

"Where the state court does not decide against a petitioner or appellant upon an independent state ground, but deeming the federal question to be before it, actually

after the invalidation of the gender-based alimony statutes is a matter which we cannot, and would not, predict.

entertains and decides that question adversely to the federal right asserted, this Court has jurisdiction to review the judgment if, as here, it is a final judgment. We cannot refuse jurisdiction because the state court might have based its decision, consistently with the record, upon an independent and adequate non-federal ground." *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95, 98 (1938). Accord, *United Air Lines, Inc.* v. *Mahin,* 410 U. S. 623, 630–631 (1973); *Poafpybitty* v. *Skelly Oil Co.,* 390 U. S. 365, 375–376 (1968); *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192, 197 n. 1 (1944); *International Steel & Iron Co.* v. *National Surety Co.,* 297 U. S. 657, 666 (1936); *Grayson* v. *Harris,* 267 U. S. 352, 358 (1925); *Red Cross Line* v. *Atlantic Fruit Co.,* 264 U. S. 109, 120 (1924); *Rogers* v. *Hennepin County,* 240 U. S. 184, 188–189 (1916). See C. Wright, Federal Courts, at 544.[6]

Our analysis of these three preliminary questions, therefore, indicates that we do have jurisdiction over the constitutional challenge asserted by Mr. Orr.[7] As an Art. III "case or

---

[6] The fact that the State Supreme Court merely quashed the petition for certiorari, so that the highest state court actually to decide the merits of the case was the Court of Appeals, does not alter this result. In *Cicenia* v. *Lagay,* 357 U. S. 504, 507–508, n. 2 (1958), overruled on other grounds, *Miranda* v. *Arizona,* 384 U. S. 436, 479 n. 48 (1966), for example, the New Jersey Superior Court decided the case on federal constitutional grounds, although state grounds might have been available, and the State Supreme Court denied certification without giving reasons—precisely the situation present here. In fact, the claim that an independent state ground existed was even stronger in *Cicenia* than here, because there the trial court, the Essex County Court, had rested its decision on state law. Nonetheless, *Cicenia* held:

"Since the Superior Court had dealt with petitioner's constitutional claims on the merits . . . jurisdiction exists. . . . [W]e shall not assume that the New Jersey Supreme Court's decision denying leave to appeal was based on th[e] nonfederal ground." 357 U. S., at 507–508, n. 2.

[7] Our Brother REHNQUIST's dissent contends that *Doremus* v. *Board of Education,* 342 U. S. 429 (1952), requires dismissal of Mr. Orr's appeal. The quotation from *Doremus* cited by our Brother REHNQUIST, *post,* at

controversy" has been properly presented to this Court, we now turn to the merits.[8]

## II

In authorizing the imposition of alimony obligations on husbands, but not on wives, the Alabama statutory scheme "provides that different treatment be accorded . . . on the basis of . . . sex; it thus establishes a classification subject to scrutiny under the Equal Protection Clause," *Reed* v.

---

299, merely confirms the obvious proposition that a state court cannot confer standing before this Court on a party who would otherwise lack it. But that proposition is wholly irrelevant to this case. Although a state court cannot confer standing in this Court, it can decline to place purely state-law obstacles in the way of an appellant's right to have this Court decide his federal claim. Our Brother REHNQUIST argues that a matter of state contract law, albeit unsettled, denies Orr his otherwise clear standing. But that could only be the case if the Alabama courts had construed the stipulation as continuing to bind Mr. Orr—something which the Alabama courts did not do. By addressing and deciding the merits of Mr. Orr's constitutional argument, the Alabama courts have declined to interpose this obstacle to Mr. Orr's standing.

[8] Our Brother POWELL's dissent makes two objections to our reaching the merits of this case. The first is that this Court should abstain from deciding the constitutional issue until the cause is remanded to afford the Alabama Supreme Court a second opportunity to consider the case. For authority he cites opinions applying the so-called *"Pullman* abstention" doctrine. See *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496 (1941). But that doctrine is applicable only where the state court to be deferred to has not previously examined the case. Not one of the long string of opinions cited by our Brother POWELL, *post,* at 285–286, approved abstention in a situation like this one, where the court to which the question would be referred already considered the case.

The more surprising, indeed disturbing, objection made by our Brother POWELL is the suggestion that the parties may have colluded to bring the constitutional issue before this Court. *Post,* at 288–289, and n. 4. No evidence whatever, within or outside the record, supports that accusation. And our Brother POWELL suggests none. Indeed, it is difficult to imagine what possible interest Mrs. Orr could have in helping her ex-husband resist her demand for $5,524 in back alimony.

*Reed,* 404 U. S. 71, 75 (1971). The fact that the classification expressly discriminates against men rather than women does not protect it from scrutiny. *Craig* v. *Boren,* 429 U. S. 190 (1976). "To withstand scrutiny" under the Equal Protection Clause, " 'classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.' " *Califano* v. *Webster,* 430 U. S. 313, 316–317 (1977). We shall, therefore, examine the three governmental objectives that might arguably be served by Alabama's statutory scheme.

Appellant views the Alabama alimony statutes as effectively announcing the State's preference for an allocation of family responsibilities under which the wife plays a dependent role, and as seeking for their objective the reinforcement of that model among the State's citizens. Cf. *Stern* v. *Stern,* 165 Conn. 190, 332 A. 2d 78 (1973). We agree, as he urges, that prior cases settle that this purpose cannot sustain the statutes.[9] *Stanton* v. *Stanton,* 421 U. S. 7, 10 (1975), held that the "old notio[n]" that "generally it is the man's primary responsibil-

---

[9] Appellee attempts to buttress the importance of this objective by arguing that while "[t]he common law stripped the married woman of many of her rights and most of her property, . . . it attempted to partially compensate by giving her the assurance that she would be supported by her husband." Brief for Appellee 11–12. This argument, that the "support obligation was imposed by the common law to compensate the wife for the discrimination she suffered at the hands of the common law," *id.,* at 11, reveals its own weakness. At most it establishes that the alimony statutes were part and parcel of a larger statutory scheme which invidiously discriminated against women, removing them from the world of work and property and "compensating" them by making their designated place "secure." This would be reason to invalidate the entire discriminatory scheme—not a reason to uphold its separate invidious parts. But appellee's argument is even weaker when applied to the facts of this case, as Alabama has long ago removed, by statute, the elements of the common law appellee points to as justifying further discrimination. See Ala. Const., Art. X, § 209 (married women's property rights).

ity to provide a home and its essentials," can no longer justify a statute that discriminates on the basis of gender. "No longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas," *id.*, at 14–15. See also *Craig* v. *Boren, supra,* at 198. If the statute is to survive constitutional attack, therefore, it must be validated on some other basis.

The opinion of the Alabama Court of Civil Appeals suggests other purposes that the statute may serve. Its opinion states that the Alabama statutes were "designed" for "the wife of a broken marriage who needs financial assistance," 351 So. 2d, at 905. This may be read as asserting either of two legislative objectives. One is a legislative purpose to provide help for needy spouses, using sex as a proxy for need. The other is a goal of compensating women for past discrimination during marriage, which assertedly has left them unprepared to fend for themselves in the working world following divorce. We concede, of course, that assisting needy spouses is a legitimate and important governmental objective. We have also recognized "[r]eduction of the disparity in economic condition between men and women caused by the long history of discrimination against women . . . as . . . an important governmental objective," *Califano* v. *Webster, supra,* at 317. It only remains, therefore, to determine whether the classification at issue here is "substantially related to achievement of those objectives." *Ibid.*[10]

Ordinarily, we would begin the analysis of the "needy spouse" objective by considering whether sex is a sufficiently "accurate proxy," *Craig* v. *Boren, supra,* at 204, for dependency to establish that the gender classification rests " 'upon

---

[10] Of course, if upon examination it becomes clear that there is no substantial relationship between the statutes and their purported objectives, this may well indicate that these objectives were not the statutes' goals in the first place. See Ely, The Centrality and Limits of Motivation Analysis, 15 San Diego L. Rev. 1155 (1978).

some ground of difference having a fair and substantial relation to the object of the legislation,'" *Reed* v. *Reed, supra,* at 76. Similarly, we would initially approach the "compensation" rationale by asking whether women had in fact been significantly discriminated against in the sphere to which the statute applied a sex-based classification, leaving the sexes *"not* similarly situated with respect to opportunities" in that sphere, *Schlesinger* v. *Ballard,* 419 U. S. 498, 508 (1975). Compare *Califano* v. *Webster, supra,* at 318, and *Kahn* v. *Shevin,* 416 U. S. 351, 353 (1974), with *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 648 (1975).[11]

But in this case, even if sex were a reliable proxy for need, and even if the institution of marriage did discriminate against women, these factors still would "not adequately justify the salient features of" Alabama's statutory scheme, *Craig* v. *Boren, supra,* at 202–203. Under the statute, individualized hearings at which the parties' relative financial circumstances are considered *already* occur. See *Russell* v. *Russell,* 247 Ala. 284, 286, 24 So. 2d 124, 126 (1945); *Ortman* v. *Ortman,* 203 Ala. 167, 82 So. 417 (1919). There is no reason, therefore, to use sex as a proxy for need. Needy males could be helped along with needy females with little if any additional burden on the State. In such circumstances, not even an administrative-convenience rationale exists to justify operating by generalization or proxy.[12] Similarly, since individualized hearings can

[11] We would also consider whether the purportedly compensatory "classifications in fact penalized women," and whether "the statutory structure and its legislative history revealed that the classification was not enacted as compensation for past discrimination." *Califano* v. *Webster,* 430 U. S., at 317.

[12] It might be argued that Alabama's rule at least relieves the State of the administrative burden of actions by husbands against their wives for alimony. However, when the wife is also seeking alimony, no savings will occur, as a hearing will be required in any event. But even when the wife is willing to forgo alimony, it appears that under Alabama law savings will still not accrue, as Alabama courts review the financial circumstances

determine which women were in fact discriminated against vis-à-vis their husbands, as well as which family units defied the stereotype and left the husband dependent on the wife, Alabama's alleged compensatory purpose may be effectuated without placing burdens solely on husbands. Progress toward fulfilling such a purpose would not be hampered, and it would cost the State nothing more, if it were to treat men and women equally by making alimony burdens independent of sex. "Thus, the gender-based distinction is gratuitous; without it, the statutory scheme would only provide benefits to those men who are in fact similarly situated to the women the statute aids," *Weinberger* v. *Wiesenfeld, supra,* at 653, and the effort to help those women would not in any way be compromised.

Moreover, use of a gender classification actually produces perverse results in this case. As compared to a gender-neutral law placing alimony obligations on the spouse able to pay, the present Alabama statutes give an advantage only to the financially secure wife whose husband is in need. Although such a wife might have to pay alimony under a gender-neutral statute, the present statutes exempt her from that obligation. Thus, "[t]he [wives] who benefit from the disparate treatment are those who were . . . nondependent on their husbands," *Califano* v. *Goldfarb,* 430 U. S. 199, 221 (1977) (STEVENS, J., concurring in judgment). They are precisely those who are not "needy spouses" and who are "least likely to have been victims of . . . discrimination," *ibid.,* by the institution of marriage. A gender-based classification which, as compared to a

---

of the parties to a divorce despite the parties' own views—even when settlement is reached. See *Russell* v. *Russell,* 247 Ala. 284, 286, 24 So. 2d 124, 126 (1945). Even were this not true, and some administrative time and effort were conserved, "[t]o give a mandatory preference to members of either sex . . . merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause," *Reed* v. *Reed,* 404 U. S. 71, 76 (1971).

gender-neutral one, generates additional benefits only for those it has no reason to prefer cannot survive equal protection scrutiny.

Legislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing stereotypes about the "proper place" of women and their need for special protection. Cf. *United Jewish Organizations* v. *Carey,* 430 U. S. 144, 173–174 (1977) (opinion concurring in part). Thus, even statutes purportedly designed to compensate for and ameliorate the effects of past discrimination must be carefully tailored. Where, as here, the State's compensatory and ameliorative purposes are as well served by a gender-neutral classification as one that gender classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex. And this is doubly so where the choice made by the State appears to redound—if only indirectly—to the benefit of those without need for special solicitude.

## III

Having found Alabama's alimony statutes unconstitutional, we reverse the judgment below and remand the cause for further proceedings not inconsistent with this opinion. That disposition, of course, leaves the state courts free to decide any questions of substantive state law not yet passed upon in this litigation. *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95, 109 (1938); C. Wright, Federal Courts, at 544. See *South Dakota* v. *Opperman,* 428 U. S. 364, 396 (1976) (MARSHALL, J., dissenting); *United Air Lines, Inc.* v. *Mahin,* 410 U. S., at 632; *California* v. *Green,* 399 U. S. 149, 169–170 (1970); *Schuylkill Trust Co.* v. *Pennsylvania,* 302 U. S. 506, 512 (1938); *Georgia R. & Elec. Co.* v. *Decatur,* 297 U. S. 620, 623–624 (1936). Therefore, it is open to the Alabama courts on remand to consider whether Mr. Orr's stipulated agreement to

pay alimony, or other grounds of gender-neutral state law, bind him to continue his alimony payments.[13]

*Reversed and remanded.*

MR. JUSTICE BLACKMUN, concurring.

On the assumption that the Court's language concerning discrimination "in the sphere" of the relevant preference statute, *ante*, at 281, does not imply that society-wide discrimination is always irrelevant, and on the further assumption that that language in no way cuts back on the Court's decision in *Kahn* v. *Shevin*, 416 U. S. 351 (1974), I join the opinion and judgment of the Court.

MR. JUSTICE STEVENS, concurring.

Whether Mr. Orr has a continuing contractual obligation to pay alimony to Mrs. Orr is a question of Alabama law that the Alabama courts have not yet decided. In Part I-B of his opinion, MR. JUSTICE REHNQUIST seems to be making one of two alternative suggestions:

(1) that we should decide the state-law issue; or

---

[13] *Indiana ex rel. Anderson* v. *Brand*, 303 U. S. 95, 109 (1938), is dispositive to this effect. There, the Indiana state courts had available two potential grounds for upholding the actions of a public school in dismissing a teacher. One was a matter purely of state law; the other required holding that the dismissal had not violated the Contracts Clause of the Federal Constitution. The Indiana courts chose the latter course and did not pass upon the state question. While recognizing that the state ground could have been relied upon, *Anderson* held, as we have held here, that the decision of the state court to reach the merits of the constitutional question without relying on the potential state ground gave this Court jurisdiction. As we have done here, the Court in *Anderson* proceeded to decide the federal question against the State and reversed the judgment below. The case was remanded, the Court noting that the state-law ground was still available as a defense for the school and could be so considered by the state courts. Similarly, the effect of Mr. Orr's stipulation, and any other matter of substantive state law not yet passed upon, may now be considered by the Alabama courts on remand.

(2) that we should direct the Supreme Court of Alabama to decide that issue before deciding the federal constitutional issue.

In my judgment the Court has correctly rejected both of these alternatives. To accept either—or a rather confused blend of the two—would violate principles of federalism that transcend the significance of this case.* I therefore join the Court's opinion.

Mr. Justice Powell, dissenting.

I agree with Mr. Justice Rehnquist that the Court, in its desire to reach the equal protection issue in this case, has dealt too casually with the difficult Art. III problems which confront us. Rather than assume the answer to questions of state law on which the resolution of the Art. III issue should depend, and which well may moot the equal protection question in this case, I would abstain from reaching either of the constitutional questions at the present time.

This Court repeatedly has observed:

"[W]hen a federal constitutional claim is premised on an unsettled question of state law, the federal court should stay its hand in order to provide the state courts an opportunity to settle the underlying state-law question and thus avoid the possibility of unnecessarily deciding a constitutional question." *Harris County Comm'rs Court* v. *Moore,* 420 U. S. 77, 83 (1975).

See *Elkins* v. *Moreno,* 435 U. S. 647 (1978); *Boehning* v. *Indiana State Employees Assn., Inc.,* 423 U. S. 6 (1975); *Askew* v. *Hargrave,* 401 U. S. 476 (1971); *Reetz* v. *Bozanich,*

---

*Even if I could agree with Mr. Justice Rehnquist's view that Mr. Orr's probability of success on the state-law issue is so remote that we should deny him standing to argue the federal question decided by the Alabama Supreme Court, I still would not understand how he reached the conclusion that the litigation between Mr. and Mrs. Orr is not a "case or controversy" within the meaning of Art. III.

397 U. S. 82 (1970); *Aldrich* v. *Aldrich,* 378 U. S. 540 (1964); *Dresner* v. *Tallahassee,* 378 U. S. 539 (1964); *Clay* v. *Sun Ins. Office Ltd.,* 363 U. S. 207 (1960); *Meridian* v. *Southern Bell Tel. & Tel. Co.,* 358 U. S. 639 (1959); *Spector Motor Service, Inc.* v. *McLaughlin,* 323 U. S. 101 (1944); *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496 (1941). The Court should follow this principle in the present case.

Here there are present two questions of state law, the resolution of which almost certainly will determine the outcome of this litigation, and at the least will substantially alter the issues presented. The Court concedes that Alabama properly might regard this challenge to the terms of the divorce decree as untimely, as it came for the first time—more than two years after the decree became final—in a contempt proceeding to enforce the alimony obligation. *Ante,* at 275 n. 4. Moreover, appellant had interposed no objection to the entry of the decree and the approval therein of the settlement agreement, nor had he questioned the validity of the Alabama statute. If, in these circumstances, provisions of a divorce decree are subject to collateral attack, grave questions will arise in Alabama and other States. It hardly need be said that the policy of repose embodied in a prohibition of collateral attack has especial importance with respect to divorce and alimony decrees. It is not surprising, therefore, that subsequent to its decision in this case the Alabama Court of Civil Appeals held that a claim identical to appellant's would not be considered, where the husband raised it for the first time on a motion for a new trial. *Hughes* v. *Hughes,* 362 So. 2d 910, cert. dismissed as improvidently granted, 362 So. 2d 918 (Ala. 1978), appeal docketed, No. 78–1071. This holding should apply *a fortiori* to a case where the constitutional claim was not raised until a contempt proceeding.

The second question of state law concerns the formal settlement agreement entered into between appellant and appellee, which deals in detail with the "property rights, alimony, and

other matters in dispute" between the parties, and which was approved by the divorce court. The agreement requires the husband to pay $1,240 per month for the "support and maintenance, use and comfort" of the wife for her life or until she remarries. It also specifies that the terms and provisions of the agreement "shall inure to and be binding upon the parties hereto and their respective heirs, assigns, executors, administrators and legal representatives." App. 7–15. Although the Court does not view this agreement as any obstacle to reaching the constitutional question, it does acknowledge that appellant "may have a continuing obligation to his former wife based upon that agreement"—as a matter of "state contract law" quite apart from the divorce decree. *Ante*, at 275.

If appellant's collateral attack on the terms of the divorce decree could not properly be entertained under Alabama law, or if the alimony obligation assumed by appellant in the settlement agreement remains enforceable under Alabama law, the question whether this Court constitutionally may exercise jurisdiction over the dispute would be close and difficult.[1] In addition, it would be unnecessary to consider the constitutionality of Alabama's divorce statute, as the adequate-and-independent-state-ground doctrine then would bar federal review of the judgment against appellant.[2]

---

[1] The Court confuses the questions of the existence of a case or controversy under Art. III with the application of the adequate-and-independent-state-ground doctrine. It is true that the failure of the courts below to rest their decision on a state-law ground means that we are not without power to decide the case *for that reason*. Cf. *Murdock* v. *Memphis*, 20 Wall. 590 (1875). But this does not determine whether the presence in fact of state-law grounds for the decision below bars a federal court from considering this claim under *Supervisors* v. *Stanley*, 105 U. S. 305 (1882).

[2] The Court implies that principles of equitable abstention expressed in the *Pullman* decision never can apply when the court to which the unresolved question of state law will be referred already has considered the case. *Ante*, at 278 n. 8. But, as the unusual posture of this case illustrates, a state court may have considered a case without having had the

The Court, in order to find a case or controversy present here, necessarily assumes the answer to both of the state-law questions in this case. In some circumstances such assumptions might be appropriate. We cannot anticipate every state-law issue that ultimately could bar the realization of an otherwise substantial federal claim, and the failure of either the state courts or the parties to address an issue ordinarily might indicate that it does not present a problem. But here the Court concedes the substantiality of the identified but unanswered questions. Indeed, in light of *Hughes* v. *Hughes, supra,* it could not do otherwise.

The uncertainty and ambiguity surrounding this case is accentuated by the fact that appellant apparently does not contend that the entire divorce decree is invalid; he seeks relief only from so much of the decree as imposes an alimony obligation. But this obligation is only one element of the detailed and comprehensive agreement signed by the parties and witnessed by their respective attorneys. The agreement was not made subject to the approval of the divorce court. Apart from whether the contractual obligation to pay alimony remains binding on appellant, is there a question as to the binding effect of the divorce itself upon appellee? Would she have agreed to divorce appellant without a contest, and without making a record of her grounds for divorce, unless she had the assurance of a valid and enforceable court order providing support and maintenance for her lifetime?

Apparently none of these questions was raised in either of the Alabama courts. No explanation has been offered us as to why the case is presented here in this manner.[3] In view of

---

relevant state-law questions presented to it. See n. 3, *infra.* Where this is true, the policies that underlie *Pullman* should apply with equal force.

[3] As the Court notes, in appellee's brief in the Alabama Court of Civil Appeals she stated that "[t]he appellee agrees that the issue before this Court is whether the Alabama alimony laws are unconstitutional because of the gender based classification made in the statutes." *Ante,* at 276. She

the substantiality of the unanswered questions, it must be conceded that serious doubts exist as to either the presence of a judicially cognizable case or controversy or to appellant's obtaining any advantage from his constitutional claim. The failure of the parties to raise the questions in the courts below, and of the courts to raise them *sua sponte,* cannot bind us. On the record before us it cannot be said with assurance that the interests of these parties before this Court are fully adversary or that they are not seeking—for reasons undisclosed—a purely advisory opinion on a constitutional issue of considerable importance.[4]

In these circumstances, I find the Court's insistence upon reaching and deciding the merits quite irreconcilable with the long-established doctrine that we abstain from reaching a federal constitutional claim that is premised on unsettled questions of state law without first affording the state courts

made no reference to Alabama authority that already had held that constitutional attacks on the divorce statute would not be heard unless presented at the time the divorce is contested. See *Dale* v. *Dale,* 54 Ala. App. 505, 310 So. 2d 225 (1975). Even more inexplicable, appellee before this Court has made no reference to *Hughes* v. *Hughes,* 362 So. 2d 910 (Ala. App.), cert. dismissed as improvidently granted, 362 So. 2d 918 (Ala. 1978), appeal docketed, No. 78–1071, in spite of that decision's clear relevance to this case. It is pertinent that the initial decision in *Hughes* was handed down more than seven months before appellee filed her brief before us, and that the final decision of the Supreme Court of Alabama was announced a month before argument in this case.

[4] It is curious, to say the least, that neither party in this case has raised these questions. The competency of appellee's counsel is evidenced by the thoroughness of the settlement agreement he negotiated and witnessed. Moreover, the questions not raised are neither abstruse nor difficult. In view of the way in which this case has been presented, we cannot dismiss the possibility of some rapprochement between these parties that could affect the genuineness of a case or controversy. There may well be an innocent explanation for these most unusual circumstances, but the absence of any such explanation appearing from the record suggests the wisdom of not deciding the constitutional issue.

an opportunity to resolve such questions. I therefore would remand the case to the Supreme Court of Alabama.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

In Alabama only wives may be awarded alimony upon divorce. In Part I of its opinion, the Court holds that Alabama's alimony statutes may be challenged in this Court by a divorced male who has never sought alimony, who is demonstrably not entitled to alimony even if he had, and who contractually bound himself to pay alimony to his former wife and did so without objection for over two years. I think the Court's eagerness to invalidate Alabama's statutes has led it to deal too casually with the "case and controversy" requirement of Art. III of the Constitution.

I

The architects of our constitutional form of government, to assure that courts exercising the "judicial power of the United States" would not trench upon the authority committed to the other branches of government, consciously limited the Judicial Branch's "right of expounding the Constitution" to "cases of a Judiciary Nature"[1]—that is, to actual "cases" and "controversies" between genuinely adverse parties. Central to this Art. III limitation on federal judicial power is the concept of standing. The standing inquiry focuses on the party before the Court, asking whether he has " 'such a per-

---

[1] 2 M. Farrand, The Records of the Federal Convention of 1787, p. 430 (1911). Indeed, on four different occasions the Constitutional Convention rejected a proposal, contained in the "Virginia Plan," to associate Justices of the Supreme Court in a counsel of revision designed to render advice on pending legislation. 1 id., at 21. Suggestions that the Chief Justice be a member of the Privy Council to assist the President, and that the President or either House of Congress be able to request advisory opinions of the Supreme Court were likewise rejected. 2 id., at 328–329, 340–344.

sonal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth* v. *Seldin,* 422 U. S. 490, 498–499 (1975) (emphasis in original), quoting *Baker* v. *Carr,* 369 U. S. 186, 204 (1962). Implicit in the concept of standing, are the requirements of injury in fact and causation. To demonstrate the "personal stake" in the litigation necessary to satisfy Art. III, the party must suffer "a distinct and palpable injury," *Warth* v. *Seldin, supra,* at 501, that bears a " 'fairly traceable' causal connection" to the challenged government action. *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 72 (1978), quoting *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 261 (1977). When a party's standing to raise an issue is questioned, therefore, "the relevant inquiry is whether . . . [he] has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon* v. *Eastern Kentucky Welfare Rights Org.,* 426 U. S. 26, 38 (1976). Stated differently, a party who places a question before a federal court must "stand to profit in some personal interest" from its resolution, else the exercise of judicial power would be gratuitous. *Id.,* at 39.

The sole claim before this Court is that Alabama's alimony statutes, which provide that only husbands may be required to pay alimony upon divorce, violate the Equal Protection Clause of the Fourteenth Amendment. Statutes alleged to create an impermissible gender-based classification are generally attacked on one of two theories. First, the challenged classification may confer on members of one sex a benefit not conferred on similarly situated members of the other sex. Clearly, members of the excluded class—those who but for their sex would be entitled to the statute's benefits—have a sufficient "personal stake" in the outcome of an equal protection challenge to the statute to invoke the power of the federal judiciary. Thus, a widower has standing to question

the constitutionality of a state statute granting a property tax exemption only to widows. See *Kahn* v. *Shevin,* 416 U. S. 351 (1974). Likewise, this Court has reached the merits of a retired male wage earner's equal protection challenge to a federal statute granting higher monthly old-age benefits to similarly situated female wage earners. See *Califano* v. *Webster,* 430 U. S. 313 (1977). Standing to raise these constitutional claims was not destroyed by the fact that the State of Florida in *Kahn,* and Congress in *Webster,* were capable of frustrating a victory in this Court by merely withdrawing the challenged statute's benefits from the favored class rather than extending them to the excluded class. See *Stanton* v. *Stanton,* 421 U. S. 7, 17 (1975).

Second, the challenged statute may saddle members of one sex with a burden not borne by similarly situated members of the other sex. Standing to attack such a statute lies in those who labor under its burden. For example, in *Califano* v. *Goldfarb,* 430 U. S. 199 (1977), this Court sustained a widower's equal protection challenge to a provision of the Social Security Act that burdened widowers but not widows with the task of proving dependency upon the deceased spouse in order to qualify for survivor's benefits. A similar statute was invalidated in *Frontiero* v. *Richardson,* 411 U. S. 677 (1973), at the instance of a female member of the uniformed services who, unlike her male counterparts, was required to prove her spouse's dependency in order to obtain increased quarters allowances and health benefits.

The statutes at issue here differ from those discussed above in that the benefit flowing to divorced wives derives from a burden imposed on divorced husbands. Thus, Alabama's alimony statutes in effect create two gender classifications: that between needy wives, who can be awarded alimony under the statutes, and needy husbands, who cannot; and that between financially secure husbands, who can be required to pay alimony under the statutes, and financially secure wives, who

cannot. Appellant Orr's standing to raise his equal protection claim must therefore be analyzed in terms of both of these classifications.

A

This Court has long held that in order to satisfy the injury-in-fact requirement of Art. III standing, a party claiming that a statute unconstitutionally withholds a particular benefit must be in line to receive the benefit if the suit is successful. In *Supervisors* v. *Stanley,* 105 U. S. 305 (1882), shareholders of a national bank attacked the validity of a state property tax statute that did not, contrary to federal law, permit deduction of personal debts from the assessed value of their bank stock. With respect to the constitutional claim of shareholders who had failed to allege the existence of personal debts that could be deducted under a valid statute, the Court reasoned:

> "What is there to render the [state statute] void as to a shareholder in a national bank, who owes no debts which he can deduct from the assessed value of his shares? The denial of this right does not affect him. He pays the same amount of tax that he would if the law gave him the right of deduction. He would be in no better condition if the law expressly authorized him to make the deduction. What legal interest has he in a question which only affects others? Why should he invoke the protection of the act of Congress in a case where he has no rights to protect? Is a court to sit and decide abstract questions of law in which the parties before it show no interest, and which, if decided either way, affect no right of theirs?

> "... If no such right exists, the delicate duty of declaring by this court that an act of State legislation is void, is an assumption of authority uncalled for by the merits

of the case, and unnecessary to the assertion of the rights of any party to the suit." *Id.,* at 311–312.

It is undisputed that the parties now before us are "a needy wife who qualifies for alimony and a husband who has the property and earnings from which alimony can be paid." 351 So. 2d 906, 907 (1977) (Jones, J., dissenting). Under the statute pertinent to the Orrs' divorce, alimony may be awarded against the husband only "[i]f the wife has no separate estate or if it be insufficient for her maintenance." Ala. Code § 30–2–51 (1975). At the time of their divorce, Mr. Orr made no claim that he was not in a position to contribute to his needy wife's support, much less that she should be required to pay alimony to him.[2] On the contrary, the amount of alimony awarded by the Alabama trial court was agreed to by the parties, and appellant has never sought a reduction in his ali-

[2] The Court suggests that "[i]t may be that appellant's Circuit Court motion challenging the constitutionality of the statutes could be construed as constituting a claim for alimony." *Ante,* at 271–272, n. 2. The Court further notes that in any event, "the state courts did not challenge appellant's standing on this or any other ground." *Ibid.*

Appellant's motion, made in response to the court's order to show cause why he should not be judged in contempt, provides in pertinent part:

"WHEREFORE, your Respondent moves the Court for an order decreeing that:

"1. *Code of Alabama,* Title 34, §§ 31–33 arbitrarily discriminate against male spouses and thus are in violation of the equal protection clause of the United States Constitution and thereby are unconstitutional.

"2. A permanent injunction be issued against the continued enforcement of these statutes.

"3. The decree ordering your Respondent to pay the Complainant alimony be rendered null and void." App. to Juris. Statement 24a. How this can be construed as constituting a claim for alimony is beyond me. That the state courts did not challenge appellant's standing on his failure to claim entitlement to alimony is wholly irrelevant. We are not here concerned with the question whether Mr. Orr lacked standing under state law to bring this suit in an Alabama court. The Case and Controversy Clause of Art. III is a constitutional limitation on the jurisdiction of *federal* courts. See *Doremus* v. *Board of Education,* 342 U. S. 429 (1952).

mony obligation on the ground of changed financial circumstances. See *Davis* v. *Davis*, 274 Ala. 277, 147 So. 2d 828 (1962); *Garlington* v. *Garlington*, 246 Ala. 665, 22 So. 2d 89 (1945). On these facts, it is clear that appellant is not in a position to benefit from a sex-neutral alimony statute.[3] His standing to raise the constitutional question in this case, therefore, cannot be founded on a claim that he would, but for his sex, be entitled to an award of alimony from his wife under the Alabama statutes.

## B

The Court holds that Mr. Orr's standing to raise his equal protection claim lies in the burden he bears under the Alabama statutes. He is required to pay alimony to his needy former spouse while similarly situated women are not. That

---

[3] The Court states that appellant's standing is rendered "unassailable" by his allegations (1) that under Alabama law a man must maintain his wife in a manner to which she has been accustomed, and (2) that alimony stipulations are reviewed as to their fairness to the wife before being incorporated into court decrees. *Ante*, at 273–274, n. 3. The Court interprets these allegations as an argument by appellant "that a gender-neutral statute would result in lower payments on his part." *Ibid.*

First, appellant nowhere argues that his alimony obligation would have been less under a sex-neutral statute. The allegations cited by the Court are made in support of appellant's contention that the Alabama alimony statutes were inspired by "archaic notions" about the proper role of women—a contention going to the merits of his equal protection claim rather than his standing to raise it. Second, since his alimony obligation was fixed by an agreement between the parties, appellant could not have seriously made such an argument in any event. Third, even if he had made the argument attributed to him by the Court, it is patently meritless. A gender-neutral alimony statute, by definition, treats husbands and wives the same. Presumably, therefore, a husband claiming under such a statute would be entitled to an amount sufficient to support him in the manner to which he had been accustomed and would be entitled to judicial review of the fairness of any alimony stipulation before its incorporation into the court decree. Far from rendering Mr. Orr's standing "unassailable," the allegations seized upon by the Court are utterly beside the point.

the State may render Mr. Orr's victory in this Court a hollow one by neutrally extending alimony rights to needy husbands does not, according to the Court, destroy his standing, for the State may elect instead to do away with alimony altogether. The possibility that Alabama will turn its back on the thousands of women currently dependent on alimony checks for their support[4] is, as a practical matter, nonexistent. But my conclusion that appellant lacks standing in this Court does not rest on the strong likelihood that Alabama will respond to today's decision by passing a sex-neutral statute. Appellant has simply not demonstrated that either alternative open to the State—even the entire abrogation of alimony—will free him of his burden.

The alimony obligation at issue in this case was fixed by an agreement between the parties, and appellant makes no claim that the contract is unenforceable under state law. Indeed, the Court itself concedes that "despite the unconstitutionality of the alimony statutes, Mr. Orr may have a continuing obligation to his former wife based upon [their] agreement." *Ante,* at 275. The Court casually dismisses the matter, however, as one "which we cannot, and would not, predict." *Ante,* at 276 n. 5.

I cannot accede to the Court's offhand dismissal of so serious an obstacle to the exercise of our jurisdiction. It is not our duty to establish Orr's standing to have his claim decided on the merits. On the contrary, the burden is on him "to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the [uncon-

---

[4] The Court suggests that because the Alabama courts are free to hold that the constitutionality of a divorce decree entered without constitutional objection cannot be challenged in contempt proceedings, there is no reason for concern that today's decision will nullify existing alimony obligations. Alabama males currently under court order to pay alimony, however, need not wait until contempt proceedings are lodged against them to raise their constitutional challenge. Rather, they may simply petition the court for relief from the unconstitutional divorce decree.

stitutional statute], or that prospective relief will remove the harm." *Warth* v. *Seldin*, 422 U. S., at 505; *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S., at 72; *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S., at 260–261; *Simon* v. *Eastern Kentucky Welfare Rights Org.*, 426 U. S., at 38; *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 617 (1973). That appellant has not carried this burden is clearly demonstrated by the Court's acknowledgment that his alimony obligation may well be enforced under state contract law.

The Court's analysis of Mr. Orr's standing is not aided by its attempt to transform the instant case into one involving race discrimination. See *ante*, at 273. Of course, a state law imposing alimony obligations on blacks but not whites could be challenged by a black required, by operation of the statute, to pay alimony. Invalidation of the discriminatory alimony statute would relieve him of his burden. If, however, his alimony obligation was enforceable under state *contract* law independent of the challenged alimony statute, he could hardly argue that his injury was *caused* by the challenged statute. Invalidation of the statute would bring him no relief. Accordingly, the exercise of federal judicial power on his behalf "would be gratuitous and thus inconsistent with the Art. III limitation." *Simon* v. *Eastern Kentucky Welfare Rights Org., supra*, at 38.

Nor is the Court's conclusion supported by *Linda R. S.* v. *Richard D., supra*. At issue in *Linda R. S.* was a state statute subjecting to criminal prosecution any "parent" failing to support his "children." State courts had consistently construed the statute to apply solely to the parents of legitimate children and to impose no duty of support on the parents of illegitimate children. The mother of an illegitimate child, claiming that the "discriminatory application" of the statute violated the Equal Protection Clause, sought an injunction directing the local district attorney to prosecute the father of her child for violating the statute. This Court held that she lacked stand-

ing to raise her claim. While she "no doubt suffered an injury stemming from the failure of her child's father to contribute support payments," she had made "no showing that her failure to secure support payments result[ed] from the nonenforcement, as to her child's father, of [the child-support statute]." 410 U. S., at 618.

> "Thus, if appellant were granted the requested relief, it would result only in the jailing of the child's father. The prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative. Certainly the 'direct' relationship between the alleged injury and the claim sought to be adjudicated which previous decisions of this Court suggest is a prerequisite of standing, is absent in this case." *Ibid.*

Like appellant in *Linda R. S.,* Mr. Orr has failed to show a "substantial likelihood" [5] that the requested relief will result in termination of his alimony obligation. Thus, far from supporting the Court's finding of standing in appellant Orr, *Linda R. S.* leads inescapably to the opposite conclusion.[6]

---

[5] "Our recent cases have required no more than a showing that there is a 'substantial likelihood' that the relief requested will redress the injury claimed to satisfy the second prong of the constitutional standing requirement." *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 75 n. 20 (1978).

[6] The Court seizes on our gratuitous observation in *Linda R. S.* that " 'the proper party to challenge the constitutionality of [the child-support statute] would be a parent of a legitimate child who has been prosecuted under the statute. Such a challenge would allege that because the parents of illegitimate children may not be prosecuted, the statute unfairly discriminates against the parents of legitimate children.' 335 F. Supp., at 806." 410 U. S., at 619 n. 5. As a statement on standing to challenge a discriminatory criminal statute, the quoted passage cannot be faulted. Clearly, a parent prosecuted under such a statute would satisfy both the injury-in-fact and the causation requirements of standing—invalidation of the statute would totally remove the prosecuted parent's harm. In the instant case, however, the Court itself admits that today's decision may well be gratuitous insofar as appellant Orr is concerned.

## II

Nor is appellant's lack of standing somehow cured by the fact that the state courts reached and decided the merits of his constitutional claim. Article III is a jurisdictional limitation on federal courts, and a state court cannot transform an abstract or hypothetical question into a "case or controversy" merely by ruling on its merits. In *Doremus* v. *Board of Education*, 342 U. S. 429 (1952), this Court held that a taxpayer lacked the requisite financial interest in the outcome of a First Amendment challenge to a state statute requiring Bible reading in public schools. In dismissing the taxpayer's appeal from an adverse ruling in the State's highest court, this Court held:

> "We do not undertake to say that a state court may not render an opinion on a federal constitutional question even under such circumstances that it can be regarded only as advisory. But, because our own jurisdiction is cast in terms of 'case or controversy' we cannot accept as the basis for review, nor as the basis for conclusive disposition of an issue of federal law without review, any procedure which does not constitute such." *Id.*, at 434.

Appellant's case, having come to us on appeal rather than on writ of certiorari, is much like Marbury's case in that Congress conferred upon each litigant the right to have his claim heard in this Court. But here, as in *Marbury* v. *Madison*, 1 Cranch 137 (1803), and *Doremus, supra,* we are, in my opinion, prevented by Art. III of the Constitution from exercising the jurisdiction which Congress has sought to confer upon us.

## III

Article III courts are not commissioned to roam at large, gratuitously righting perceived wrongs and vindicating claimed rights. They must await the suit of one whose advocacy is inspired by a "personal stake" in victory. The Fram-

ers' wise insistence that those who invoke the power of a federal court personally stand to profit from its exercise ensures that constitutional issues are not decided in advance of necessity and that the complaining party stand in the shoes of those whose rights he champions. Obedience to the rules of standing—the "threshold determinants of the propriety of judicial intervention" [7]—is of crucial importance to constitutional adjudication in this Court, for when the parties leave these halls, what is done cannot be undone except by constitutional amendment.

Much as "Caesar had his Brutus; Charles the First his Cromwell," Congress and the States have this Court to ensure that their legislative Acts do not run afoul of the limitations imposed by the United States Constitution. But this Court has neither a Brutus nor a Cromwell to impose a similar discipline on it. While our "right of expounding the Constitution" is confined to "cases of a Judiciary Nature," we are empowered to determine for ourselves when the requirements of Art. III are satisfied. Thus, "the only check upon our own exercise of power is our own sense of self-restraint." *United States* v. *Butler,* 297 U. S. 1, 79 (1936) (Stone, J., dissenting). I do not think the Court, in deciding the merits of appellant's constitutional claim, has exercised the self-restraint that Art. III requires in this case. I would therefore dismiss Mr. Orr's appeal on the authority of *Doremus* v. *Board of Education, supra.*

---

[7] *Warth* v. *Seldin,* 422 U. S. 490, 518 (1975).