OPINION OF THE COURT
David B. Saxe, J.
A. INTRODUCTION
An individual’s freedom of opportunity to work and earn a living has been recognized as a fundamental liberty. (Truax v *631 Raich, 239 US 33, 41.) Discrimination in employment affects not only the sharing in certain tangible benefits of being an American citizen, but also an individual’s ability to provide decently for himself and his family in a job or profession for which he is qualified (Culpepper v Reynolds Metal Co., 421 F2d 888, 891).
For too long a time, homosexuals have been the victims of this type of discrimination. As a result, an important unit of our municipal government — the New York City Board of Estimate — through a resolution, requested certain private agencies seeking renewal of various social service contracts, to eschew discrimination based on sexual orientation in their hiring or firing of persons connected with these contracts.
Two groups affected by this turn of events — the Roman Catholic Archdiocese of New York and the Salvation Army — in furtherance of what appears to be the moral imperatives of their dogma, which views homosexuality as evil, rather than in furtherance of their presumed devotion to charitable endeavors and good works, have asked this court to issue preliminary injunctive relief against the enforcement of this resolution.
 Their request is denied for two principal reasons: first, the Board of Estimate resolution under scrutiny is within the realm of authority that is properly exercised by the Board of Estimate; and second, the resolution is merely an expression of what I perceive to be the existing law — that discrimination in employment based on sexual orientation or affectional preference is a violation of equal protection under the Fourteenth Amendment to the United States Constitution and section 11 of article I of the New York State Constitution.
B. THE PARTIES
The plaintiffs are various nonprofit charitable organizations sponsored by and affiliated with the Salvation Army (Salvation Army v Board of Estimate, Supreme Ct, NY County, index No. 24895/1984) and the Roman Catholic Archdiocese of New York (Under 21 v City of New York, Supreme Ct, NY County, index No. 24891/1984). Each plaintiff agency provides social services to children, the aged, and others in need in New York City (City) under contracts with the City which contributes a substantial portion (40% to 90%) of the costs of running these programs. These contracts expired on October 31, 1984. The extension agreements offered to each plaintiff contained provisions requiring them not to discriminate in employment on the basis of “sexual orientation” and “affectional preference”, i.e., homosexuality. The plaintiffs contend that their religious principles *632 teach them that homosexual behavior is contrary to the teachings of the Bible and destructive of family life and they cannot contract not to discriminate on this basis.
These provisions were included in the extension contracts by the Board of Estimate which is charged with the duty of approving personal service contracts (NY City Charter, § 349) and specifically through Resolution No. 382, which was adopted on October 25, 1984, and is applicable to the social services contracts which expired on October 31, 1984. The plaintiffs have applied for preliminary injunctive relief seeking to enjoin the defendants from incorporating into the affected contracts any provision prohibiting discrimination in hiring by the plaintiffs based on sexual orientation and affectional preference. At the hearing, I granted the plaintiffs a temporary restraining order to maintain the status quo.
The plaintiffs question the validity of Resolution No. 382, contending that (1) the defendants are precluded from taking this action because of the application of the doctrines of res judicata and collateral estoppel and (2) the Board’s action constitutes an illegal exercise of legislative power. The City takes the position that Resolution No. 382 was a valid exercise of the Board’s power to approve contracts and that neither res judicata nor collateral estoppel apply here.
C. THE PRIOR CASE
Earlier this year, the plaintiffs brought an action (Under 21 v City of New York, Supreme Ct, NY County, Sept. 5, 1984, index No. 15046/1984) to invalidate Executive Order 50 (EO 50) which was issued by Mayor Edward I. Koch on April 25, 1980. Executive Order 50 required that all contracts with the City of New York contain a provision prohibiting City contractors from discriminating based on “sexual orientation” or “affectional preference.” Also, at issue in that action was Resolution No. 520, adopted by the Board of Estimate on June 28, 1984, which generally approved and ratified the Mayor’s executive order. It is interesting to note that apparently the prior leadership of the Archdiocese of New York did not object to this mayoral order and at present, the Brooklyn Diocese finds no conflict between agreeing to the order and providing secular services on behalf of the City.
The prior court decided that EO 50 was an invalid exercise of mayoral power and granted the plaintiffs summary judgment. (Under 21 v City of New York, Supreme Ct, NY County, Sept. 5, 1984, index No. 15046/1984.)
*633 Relying on various cases dealing with executive power (Subcontractors Trade Assn. v Koch, 62 NY2d 422; Matter of Broidrick v Lindsay, 39 NY2d 641; Matter of Fullilove v Beame, 48 NY2d 376), the court ruled that EO 50 was invalid because it created new policies beyond those established by legislative authority. The court stated: “Although the Mayor is vested with the power to issue regulations implementing present anti-discrimination legislation, he is not empowered to by-pass the legislative process and create new social policy absent a proper legislative basis.”
Concerning Resolution No. 520, passed by the Board of Estimate, the court likewise ruled it invalid because: “The fact that the Board of Estimate subsequently ratified and approved the Executive Order is of no consequence because the Board cannot validate an invalid Mayoral Order.”
D. RES JUDICATA AND COLLATERAL ESTOPPEL
The plaintiffs contend here that the City is bound by Special Term’s decision in the prior case and as a result is barred by the doctrine of res judicata and collateral estoppel from relitigating the issue of whether the Board of Estimate has the power to enact and enforce a contractual provision prohibiting employment discrimination on the basis of “sexual orientation” or “affectional preference.”
The standard for the application of the doctrines of res judicata and collateral estoppel are: “that the issue as to which preclusion is sought be identical with the issue decided in the prior proceeding, that the issue have been necessarily decided in the prior proceeding, and that the litigant who will be held precluded in the present proceeding have had a full and fair opportunity to litigate the issue in the prior proceeding”. (Capital Tel. Co. v Pattersonville Tel. Co., 56 NY2d 11, 17; see, also, Shanley v Callanan Inds., 54 NY2d 52; Schwartz v Public Administrator, 24 NY2d 65, 71.) Additionally, the issue “must be the point actually to be determined in the second action or proceeding such that ‘a different judgment in the second would destroy or impair rights or interests established by the first’ ”. (Ryan v New York Tel. Co., 62 NY2d 494, 501, quoting from Schuylkill Fuel Corp. v Nieberg Realty Corp., 250 NY 304, 307 [Cardozo, Ch. J.].)
The plaintiffs state the issue too broadly in support of their position that the issues are identical in the two actions. They contend that the issue in both actions is: whether the Board of *634 Estimate, absent legislative authority, may compel City contractors to agree not to discriminate in employment decisions based on “sexual orientation” or “affectional preference.”
Primarily, the issue in the prior action was the validity of an executive order and the power of the Mayor in enacting it. Based on the finding that the executive order was invalid, the court held that Board Resolution No. 520, insofar as it ratified an invalid executive order, was equally invalid. ()Under21 v City of New York, supra.) Resolution No. 520 was a blanket resolution passed by the Board of Estimate of general applicability to all City contracts. Resolution No. 382, the validity of which is questioned in this action, varies significantly from the resolution which the prior court ruled upon. It was adopted by the Board of Estimate independently of any executive order and its application was not general but rather was directed at the specific contracts with the plaintiffs, which expired on October 31, 1984. Thus, despite the broad language in the prior court’s decision to the effect that the Board cannot legislate and cannot create social policy, it is clear that the earlier court did not and could not consider the powers of the Board of Estimate to adopt a resolution of specific import that is presently before this court. So, although both resolutions involve an attempt to proscribe discrimination based on sexual preference, the issues presented in the two cases differ substantially and compel the result that neither res judicata nor collateral estoppel are applicable.
B. PRELIMINARY INJUNCTION
In order to succeed on a motion for a preliminary injunction, the plaintiffs are required to show a likelihood of ultimate success on the merits, irreparable injury in the absence of preliminary relief, and a balance of the equities in their favor. (Albini v Solork Assoc., 37 AD2d 835.) Here, they must demonstrate that it is likely that they will succeed in proving that Resolution No. 382 is invalid. I find that they have not done this and accordingly the injunctive relief demanded is denied.
F. IS THE BOARD OF ESTIMATE LEGISLATING UNDER THE GUISE OF APPROVING CONTRACTS?
In New York City, the power to legislate is vested in the City Council (NY City Charter, § 21). The plaintiff agencies contend that any decision to ban employment discrimination against homosexuals by City contractors is a legislative function dealing with extrinsic social policy matters, not proper for consideration by the Board of Estimate.
*635 Through the New York City Charter, the Board of Estimate is vested with various powers among which are the powers relating to the approval of noncompetitive consultant and personal service contracts. (NY City Charter, § 349, subd a.)
Subdivision a of section 349 of the New York City Charter states that: “Except as otherwise provided by resolution of the board of estimate, no contract for the performance of technical, consultant or personal services for which competitive bidding is [improper], involving the expenditure of more than [$10,000] shall be awarded except after public hearing * * * and approval by a majority of the board of estimate.”
The Board may consider a broad range of factors when deciding whether to approve a particular contract. By virtue of this power of approval, exercised in light of the best interests of the City, the Board necessarily has the power to modify the terms of the contract or insist that particular clauses be included in contracts. (See, generally, Matter of Lower East Side Joint Planning Council v New York City Bd. of Estimate, 83 AD2d 526, affd 56 NY2d 717.)
As a result of Resolution No. 382, the Board of Estimate approved the proposed extension and modification agreements with the plaintiffs. Included in the proposed contracts was the following clause upon which this action is predicated:
“The Contractor agrees that it will not refuse to hire or employ, or bar or discharge from employment, or discriminate against any person in compensation or in terms, conditions or principle of employment because of age, race, creed, color, national origin, sex, marital status, sexual orientation or affectional preference.
“The City recognizes that agreement by the Contractor not to discriminate on grounds of sexual orientation or affectional preference does not constitute an endorsement by the Contractor of any particular sexual orientation or affectional preference. The City further recognizes that such agreement shall not in any way prevent the Contractor from making employment decisions based on job-related conduct” (emphasis added).
The plaintiffs contend that the Board’s resolution is an impermissible attempt to legislate. To state that a resolution is legislative in nature is, however, merely to state a conclusion. The issue, more properly framed, is not whether a resolution is legislative, but rather whether it was a proper exercise of the Board’s power.
The defect that Resolution No. 520 (involved in the prior action) suffered from, in addition to being an attempt to validate *636 an invalid executive order, was that it was a blanket resolution of general application requiring the insertion in all City contracts of the contested clause dealing with employment discrimination.
Matter of Luboil Heat & Power Corp. v Pleydell (178 Misc 562, 563), relied on by each side, involved a Board resolution aimed at “fostering American products and aiding American labor” adopted pursuant to the Board’s power with respect to the award of competitive contracts (NY City Charter, § 343, subd b). The resolution provided for the preference for all contracts of domestic goods over foreign goods unless the bid. for the foreign goods was at least 25% less than that for the domestic goods. This resolution was declared invalid because under the New York City Charter the Board was required, when a contract was not being awarded to the lower bidder, to do so by a three-fourths vote of the Board. The Board’s action in Luboil (supra) was therefore impermissible because it directly conflicted with the legislative procedure insofar as it was an attempt to bypass the required three-fourths vote as mandated by the New York City Charter. Although the court did not question the policy which the Board was attempting to effectuate, it held that the manner by which the Board had chosen to implement that policy, by passing a blanket resolution of general application, failed to satisfy section 343 of the New York City Charter requiring specific action on each contract.
Although neither Resolution No. 520 nor Resolution No. 382 directly conflicts with any legislative mandate, Resolution No. 520, which was declared invalid in the prior case, suffered from the same flaw as those regulations under scrutiny in Luboil (supra) in that it was an attempt to rubber stamp a new requirement into all City contracts instead of considering the factors applicable to each contract or set of contracts. Resolution No. 382, on the other hand, being specific and limited in application to one group of similar contracts, does not suffer from these infirmities.
In Matter of Natilson v Hodson (264 App Div 384, affd 289 NY 842), the Board of Estimate resolved that no City funds appropriated by the Board “ ‘shall be used for the payment of wages or salary of any employee * * * who does not give his whole time to his duties and no employee shall be eligible to receive compensation from these funds who is engaged in any other occupation, profession, business or employment’ ” (264 App Div, at p 384). Pursuant to this resolution, the petitioner, who held employment outside his civil service position with the City, was dis *637 charged. In a suit, challenging the validity of the Board’s resolution, the court held that it was invalid because it exceeded the Board’s province to establish new civil service requirements since those issues should more properly be addressed by either the Commissioner of Civil Service or the legislative body. Here, the resolution of the Board of Estimate relates to the award of personal service contracts, a matter expressly placed within the Board’s jurisdiction by section 349 of the New York City Charter. Moreover, the Court of Appeals explained in Flood v Kennedy (12 NY2d 345), that the holding in Matter of Natilson v Hodson (supra), was based on the fact that the regulation prohibiting outside employment bore no legitimate relationship to the personnel needs of the City agency involved and was, hence, unreasonable. In Flood v Kennedy (supra), on the other hand, a regulation by the police department prohibiting additional work by policemen, was upheld as valid. The court stated: “The distinction between the policemen and firemen cases and the Natilson case (289 N.Y. 842, supra) is that the rule in the latter was an attempt to keep social welfare employees from taking on other jobs. The courts held that the welfare department’s rule was illegal since there was nothing about welfare department employment to justify such a rule, whereas policemen and firemen must be available for emergency duties at all hours” (p 348).
Here, the resolution bears a legitimate relationship to the best interests of the City and is within the realm of authority exercisable by the Board of Estimate. Resolution No. 382 appropriately insures that contractors who have received funding from the City for the purpose of providing services on behalf of the City do not increase the City’s costs through invidious discrimination in their hiring decisions. This resolution does not conflict with any statute or case law and properly reflects the City’s policy of nondiscriminatory hiring based on merit for those who will perform City services. Inclusion of the disputed clause into the contracts as a result of the resolution simply insures prospective nondiscrimination by the plaintiff agencies who have contracted to provide services — it does not impose a quota, percentage or other affirmative action plan to remedy the effects of past discrimination. (Matter of Broidrick v Lindsay, 39 NY2d 641, supra; Matter of Fullilove v Beame, 48 NY2d 376, supra; Subcontractors Trade Assn. v Koch, 62 NY2d 422, supra.)
It is within the Board’s power to determine that limiting the award of service contracts to agencies who will refrain from discriminatory practices serves the City’s best financial interests by insuring that contract costs are not artificially and *638 unnecessarily inflated as a result of a construction of the labor pool that is produced by discrimination. (Fullilove v Beame, supra.)
Moreover, there is evolving law to support the proposition that arbitrary treatment of persons based solely on their sexual preference may constitute an infringement of those person’s rights under the United States Constitution and the Constitution of the State of New York. (See infra.) In discharging its duty to approve contracts, the Board of Estimate was empowered to take steps to insure that the plaintiff agencies, as a term of their contracts, would not engage in discriminatory actions of this type. This is particularly necessary with regard to these plaintiffs who have explicitly stated an intention to discriminate in their hiring on this basis of one’s sexual orientation.
G. DISCRIMINATION ON THE BASIS OF SEXUAL ORIENTATION OR AFFECTIONAL PREFERENCE CONSTITUTES A VIOLATION OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 11 OF ARTICLE I OF THE NEW YORK STATE CONSTITUTION.
Resolution No. 382 prohibiting employment discrimination in hiring by the plaintiff agencies, merely restates the emerging law in the United States' and New York State that discrimination based solely on one’s sexual preference is a violation of an individual’s constitutionally guaranteed equal protection rights. Thus, the Board of Estimate certainly could not have been exceeding their power by insisting that a clause be inserted into the plaintiffs’ contracts which merely restates the concepts of law of our State and country, which the plaintiff agencies would have been constitutionally bound to adhere to even in the absence of this clause.
The Fourteenth Amendment to the United States Constitution reads in pertinent part: “No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws” (§ 1).
The New York State Constitution provides similar protections to persons within its boundaries:
“§ 11. [Equal protection of laws; discrimination in civil rights prohibited]
“No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of *639 race, color, creed or religion, be subjected to any discrimination in his civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.”
The Supreme Court has declared that certain categories of classifications such as race, national origin and alienage to be presumptively “suspect” or “invidious” under the Fourteenth Amendment. (See Loving v Virginia, 388 US 1; Korematsu v United States, 323 US 214; Graham v Richardson, 403 US 365.) But, the reach of the Fourteenth Amendment goes much further than simply to the “suspect” classifications — it is intended to abolish “all caste-based and invidious class-based” discrimination. (Plyler v Doe, 457 US 202, 213.)
In Lehr v Robertson (463 US 248, 265), the Supreme Court emphasized the broad scope of the Fourteenth Amendment’s protections as follows: “The concept of equal justice under law requires the State to govern impartially * * * The sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective.”
Various cases have arisen dealing with discrimination against homosexuals, and the courts have, in nearly every instance, held that the constitutional right to equal protection prohibits such discrimination by any State entity on a per se basis.
In Norton v Macy (417 F2d 1161) where a Federal employee was dismissed pursuant to the regulation authorizing dismissal for “infamous * * * immoral, or notoriously disgraceful conduct” (p 1163) for the making of an alleged “homosexual advance” the court stated: “[T]he notion that it could be an appropriate function of the federal bureaucracy to enforce the majority’s conventional codes of conduct in the private lives of its employees is at war with elementary concepts of liberty, privacy and diversity.” (Supra, p 1165.)
The court held that discrimination on account of homosexuality per se violates due process. In order to justify dismissal the court stated that it must be demonstrated that there is “some reasonably foreseeable, specific connection between an employee’s potentially embarrassing conduct and the efficiency of the service”. (Supra, at p 1167.) This the employer failed to do and the court reversed the lower court’s previous grant of summary judgment in favor of the Government.
Many cases have followed the lead of Norton v Macy (supra), recognizing equal protection rights for homosexuals and holding *640 that discrimination based on homosexuality, per se, is unconstitutional under the United States Constitution and various State Constitutions.
Thus, in Morrison v State Bd. of Educ. (1 Cal 3d 214) it was held that the private homosexual activities of a public school teacher did not justify the revocation of a teaching license in the absence of a showing of job relatedness.
At issue in Society for Individual Rights v Hampton (63 FRD 399, affd in other part 528 F2d 905) was the United States Civil Service Commission policy excluding from Federal employment all persons who were known to be homosexuals, pursuant to which a plaintiff was discharged. The court found that there was no demonstration of any relationship to the efficiency of the service other than the “hypothetical embarrassment and public contempt which the government would suffer if it were known that it employed homosexual persons [who] would, in some vague, unspecified way, hinder the government’s performance” {supra, at p 401). The court held this insufficient and granted summary judgment directing reinstatement.
In Gay Law Students Assn. v Pacific Tel. & Tel. Co. (24 Cal 3d 458), the policy of the defendant, a public utility, in practicing discrimination against homosexuals in the hiring, firing and promotion of employees, was challenged as violative of the equal protection guarantee of the United States Constitution and the California State Constitution insofar as the defendant arbitrarily denied qualified homosexuals employment opportunities afforded other individuals.
The court analyzed the situation as follows: “In analyzing this constitutional contention, we begin from the premise that both the state and federal equal protection clauses clearly prohibit the state or any governmental entity from arbitrarily discriminating against any class of individuals in employment decisions * * * Moreover, past decisions of this court establish that this general constitutional principle applies to homosexuals as well as to all other members of our polity; under California law, the state may not exclude homosexuals as a class from employment opportunities without a showing that an individual’s homosexuality renders him unfit for the job from which he has been excluded * * * Courts in other jurisdictions have reached similar conclusions.” {Supra, at p 467.)
Finding then that the California and United States Constitutions protect persons based on their sexual preferences from discrimination, the court went on to hold that such discrimination practiced by a public utility which enjoys a State protected *641 monopoly constitutes State action. The court, emphasizing the importance of freedom of discrimination in employment, stated: “Protection against the arbitrary foreclosing of employment opportunities lies close to the heart of the protection against ‘second-class citizenship’ which the equal protection clause was intended to guarantee. An individual’s freedom of opportunity to work and earn a living has long been recognized as one of the fundamental and most cherished liberties enjoyed by members of our society * * * ‘discrimination in employment is one of the most deplorable forms of discrimination known to our society, for it deals not with just an individual’s sharing in the “outer benefits” of being an American citizen, but rather the ability to provide decently for [oneself and] one’s family in a job or profession for which he qualifies and chooses’.” (Supra, at p 470.)
The court held that the “California Constitution precludes a public utility’s management from automatically excluding all homosexuals from consideration for employment positions — or, by [that] token, from excluding any classification of persons because of personal whims or prejudices or any other arbitrary reason”. (Supra, at pp 474-475.) The court however cautioned that “the constitutional provision does not deny a public utility’s management the authority to exercise legitimate judgment in employment decisions” (p 475).
In New York, the issue of whether an applicant who was a homosexual was thereby rendered unfit to be a member of the State Bar was raised in Matter of Kimball (33 NY2d 586). The Court of Appeals said no, reversing the decision of the Appellate Division, Second Department (40 AD2d 252, 258), and adopted the reasoning of the dissenting opinion in the Appellate Division where it was stated that “an applicant for admission to the Bar in New York * * * cannot be considered unfit or lacking the requisite character to practice law, merely because he is an avowed homosexual”.
Other cases, not dealing specifically with the right to employment of homosexuals, nevertheless, are relevant to the rights accorded to homosexuals under the equal protection clause prohibiting arbitrary classifications based on. sexual preference.
Thus, M. P. v S. P. (169 NJ Super 425) held that homosexuality per se is not a sufficient ground for removing children from the custody of their mother. (See, also, Doe v Doe, 222 Va 736.)
Nor may a county government fire an employee for addressing a public body on the subject of civil rights for homosexuals. (Van Ooteghem v Gray, 628 F2d 488, affd en banc 654 F2d 304, cert den 455 US 909.)
*642 So, too, it has been held that a university must permit a gay organization to hold social functions on campus. (Gay Students Organization v Bonner, 509 F2d 652.)
Further, our own Court of Appeals struck down the New York State consensual sodomy statute holding that it violated constitutional guarantees of privacy and equal protection. (People v Onofre, 51 NY2d 476, cert den 451 US 987.)
Moreover, at least one case has held that differential treatment based on sexual preference requires an “intermediate level of review”. (Hatheway u Secretary of Army, 641 F2d 1376, 1382, cert den sub nom. Hatheway v Marsh, 454 US 864.) That court, citing Orr v Orr (440 US 268), the leading case dealing with gender-based discrimination, held that such a classification “can be sustained only if it bears a substantial relationship to an important governmental interest”. (Supra, at p 1382.)
The cases dealing with employment discrimination establish that there must be proof of a “rational nexus” between the alleged deficiency and job performance before dismissal based on one’s homosexuality will be permitted. (See Safransky v Personnel Bd., 62 Wis 2d 464.)
I conclude that the right of individuals to be free of arbitrary and disparate treatment in their employment solely on the basis of sexual preference is one of constitutional magnitude both under the Fourteenth Amendment and under the New York State Constitution.
The constitutional right of equal protection is self-executing; no enabling legislation is required to give it force, meaning or scope. (Lochner v New York, 198 US 45; Orr v Orr, supra.) Thus, in this case, the Board of Estimate’s action in adopting Resolution No. 382 was not legislative because it stated the law as it presently is. No new social policy was enunciated. No new contractual condition was sought to be imposed upon the plaintiff agencies. The Board, consistent with its duty to approve contracts, merely included within the contract, by means of the resolution, the constitutional obligations by which the parties are necessarily bound. (See, generally, Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv L Rev 489.)
Accordingly, I hold that homosexuality is a protected category under both the State and Federal Constitutions.
H. STATE ACTION
Although the plaintiffs are private agencies, and the proscriptions of constitutional law with regard to equal protection do not generally extend to private conduct, I hold that based *643 on the concept of “state action”, the plaintiffs are directly subject to the constitutional mandates ordinarily applicable only to government entities.
In Perez v Sugarman (499 F2d 761) two private New York City child care institutions, not dissimilar from the plaintiff agencies here, were found to be engaging in State action and therefore subject to the same constitutional standards as governmental entities.
The court stated: “As a general rule, the proscriptions of the Fourteenth Amendment do not extend to private conduct. But ‘[c]onduct that is formally “private” may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action.’ Evans v. Newton, 382 U.S. 296, 299, 86 S. Ct. 486, 488,15 L. Ed. 2d 373 (1966).” (Supra, at p 764.)
First, the court in Perez (supra) considered the fact that the institutions were performing the public function ordinarily entrusted to the State (see, e.g., Social Services Law, § 395) of responsibility “ ‘for the welfare of children who are in need of public assistance and care, support and protection’ ” (supra, at p 765). Furthermore, the court considered “the degree to which the State has insinuated itself into the actions of the private [agencies]” (p 765). Based on these factors, which are equally present in the instant case, the court determined that the actions of the private agencies were so infused with that of the government as to justify a finding of State action. Thus, it is entirely likely that the plaintiffs here in performing a public function and in receiving substantial funding from the City for that purpose are directly required, consistent with our Constitution, not to discriminate based on sexual orientation or affectional preference in the hiring of personnel.
Perez v Sugarman (supra, at p 766), however, contained a proviso that not “every action in which such an institution engages is State action” and stated that where the case does not directly involve an agency’s mode of conducting a public function but instead involves a collateral aspect of the business the State action doctrine would not necessarily apply. I hold that the hiring of employees by the plaintiff agencies here is integrally related to their public function and is not a “collateral function.” Therefore, I determine that the plaintiff agencies are performing a “state action”.
I. THE BOARD OF ESTIMATE, AS THE AGENCY OF THE CITY OF NEW YORK CHARGED WITH THE DUTY TO APPROVE CONTRACTS HAS AN *644 OBLIGATION UNDER THE STATE AND FEDERAL CONSTITUTIONS TO ENSURE THAT THE CITY’S FUNDS ARE NOT USED TO SUPPORT, ENCOURAGE OR IN ANY OTHER WAY IMPLICATE THE CITY IN THE DISCRIMINATORY CONDUCT OF OTHERS.
The constitutional principles of equal protection mandate not only that the City of New York not engage in direct discrimination against homosexuals, but also they not participate indirectly in such discrimination.
In Norwood v Harrison (413 US 455), the Supreme Court held that the State of Mississippi was prohibited from lending textbooks to private schools which practiced racial discrimination. While the court acknowledged that the schools, being private institutions, were not constitutionally precluded from discriminating, it held that they had no right to receive “state largesse, on an equal basis or otherwise”. (Supra, at p 462.) The court went on to hold that the State may not grant the aid, in the form of textbooks to the schools, because “if the school engages in discriminatory practices the State by tangible aid in the form of textbooks thereby gives support to such discrimination” (supra, at pp 464-465) and further, that it was “ ‘axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish’ ” (p 465).
To the same effect is the case of National Black Police Assn. v Velde (712 F2d 569, cert den_US_, 104 S Ct 2180) where the court held that a Federal Government may not fund local agencies known to be discriminating. The court stated: “Equal protection principles bar federal officials from engaging in racial discrimination. This constitutional obligation applies not just to direct involvement, but also to government ‘support’ of discrimination ‘through any arrangement, management, funds or property.’ Activities that the federal government could not constitutionally participate in directly cannot be supported indirectly through the provision of support for other persons engaged in such activity.” (Supra, at p 580.)
Therefore, the government has a duty not to support private discrimination; governmental entities may not provide public funds or benefits to private institutions which practice the type of discrimination which would be unconstitutional if the government itself were to engage in it. (Norwood v Harrison, supra; Gilmore v City of Montgomery, 417 US 556; Burton v Wilmington Parking Auth., 365 US 715.)
Here, the plaintiff agencies receive substantial financial funding from the City. Similar to the cases previously analyzed, *645 and consistent with its constitutionally imposed duty not to support private discrimination on the basis of sexual orientation or affectional preference, the City, by its governmental arm responsible for the approval of contracts, had the right, if not the obligation, to include this clause in the plaintiff agencies’ contracts, who have openly admitted that they intend to practice such discrimination.
This duty exists separate and apart from any finding that the plaintiff agencies are engaging in State action. Thus, even if it could be argued that the plaintiff’s activities did not rise to the level of “state action”, the City is nevertheless under the duty to ensure that it does not fund private discrimination.
J. CONCLUSION
Accordingly, the plaintiff’s requests for a preliminary injunctipn are denied. The temporary restraints are terminated.