Edwin Clyde THOMASSON,
Jr., Appellant,

v.

Mary Patricia THOMASSON, Appellee.

Supreme Court of Tennessee,
at Nashville.

Aug. 2, 1988.

W. Thomas Schmitz, Brentwood, for appellant.

Mary Frances Lyle, Bruce, Weathers, Dughman & Lyle, Nashville, for appellee.

## OPINION

FONES, Justice.

This litigation was initiated by Husband's complaint for divorce on grounds of adultery, cruel and inhuman treatment and irreconcilable differences. It was filed on 19 November 1985 and on 27 November 1985 Wife filed an original complaint for divorce on grounds of cruel and inhuman treatment and irreconcilable differences. No answer was filed by either party.

A constant stream of pre-trial motions were filed and hearings held involving principally money, child custody and visitation. A four day trial began 30 June 1986 and on 25 July 1986 the trial judge filed a memorandum opinion granting Wife a divorce on the ground of cruel and inhuman treatment and dismissing Husband's complaint for divorce. The Court of Appeals affirmed.

We granted Husband's Rule 11 application because neither of the courts below recognized in any way that Wife's own proof established Husband's cause of action for divorce on the ground of adultery, to which there was no defense under the pleadings, the proof or the law applicable to this case.

The parties were married in April 1967 and two sons were born of the marriage. At the time suit was filed, they were 14

and 10 years of age. Husband was in the military during the Vietnam War and the parties lived in Virginia, South Carolina and Georgia prior to moving to Nashville in October 1979. Wife did not want to move away from the East Coast to live in Nashville, but Husband was offered what he considered to be a good job opportunity that required the move. They purchased a home in Nashville that Wife did not like, and Husband testified that she refused to sign the papers until he promised that they would sell it as soon as possible. Husband testified that he was unable to fulfill that promise because he was fired in 1981, remaining unemployed for six months. During that period Wife worked. In 1982 she entered full-time employment as an interior decorator with Packer and Associates. She worked long hours and during the period February 1983 through November 1985 her take home earnings were $58,158. Her work as an interior designer was recognized in the September 1986 issue of *Better Homes and Gardens* magazine.

Wife testified that Husband had always dominated her, criticized her and otherwise destroyed her self-esteem; that on many occasions she had confronted him with the necessity of discussing his treatment of her and he always refused to talk about it. However, Wife wrote Husband a handwritten letter in October, 1985, that contradicts that description of their married life.

Husband denied that they had had any problems beyond normal marital adjustments and described the marriage as harmonious until his wife had a personality change in 1984 that accompanied her success as an interior designer. He acknowledged that Wife was unhappy, and admitted that he was also unhappy during the six month period that he was unemployed in 1981. He testified that with her success in the interior design business she had very little time to spend with the family, spent a great deal of money on clothes and shoes, began smoking, losing weight and exhibiting mood swings.

Husband testified that in mid-February 1985 he returned home about 9:30 p.m. from an all day business trip to Georgia and found Wife in bed asleep. The oldest son advised him that Wife had been acting strange and had gone to bed early in the evening with her shoes on. Husband aroused her and noticed that she was groggy, but she seemed pleased that he was home and nothing eventful occurred. A day or so later a friend called Husband and reported that she had received a phone call from Wife wherein Wife asked why taking sleeping pills and drinking alcohol had resulted in a failed suicide attempt.

Husband was greatly concerned upon learning that Wife had apparently attempted suicide. He contacted Dr. Doren Edwards who prescribed antidepressant medication for Wife. On 7 June Wife made a second suicide attempt at the La Quinta Inn on Harding Place and I–65 by taking sleeping pills and drinking champagne. Wife telephoned Husband who took her to Williamson County Hospital in time to abort the suicide. She was released from the hospital the following day and began seeing Judy Belsito, a psychologist, on 10 June 1985.

Wife's third suicide attempt occurred in February 1986, after commencement of divorce proceedings. Wife testified that this attempt was caused by Husband's refusal to allow her to see or communicate with the children. Husband testified that her calls to him preceding the third suicide attempt were principally about the repossession of the Oldsmobile, jointly owned by Husband and Wife, that she had been using, and upon which no payments had been made for more than three months. Again Wife took pills and drank alcohol and called husband to rescue her, which he did.

After Wife's third suicide attempt she was under the care of Dr. Suzanne Dowdy, a psychiatrist. Wife failed to tell Dr. Dowdy about her affair with Mike Joyce [to be discussed below] or about her June 1985 suicide attempt. Both Dr. Dowdy and Ms. Belsito were absolutely positive that Wife had always told them the truth.

At trial Wife attempted to attribute negligence and non-caring upon the part of Husband in the two suicide rescues and the

immediate aftermath—attempts that had no substance.

Wife testified that Husband insisted upon sexual practices that she disapproved of, such as anal and oral intercourse and using filthy language while engaged in the various acts. However, during one of her visits to Ms. Belsito, Wife reported that for a period of about one and one-half years preceding that time, Husband had shown very little interest in sex and in fact resisted her advances to engage in sex. Apparently the practices of which she complained were not disapproved of to the extent that they threatened the marriage.

Most of the testimony of the parties and their witnesses concerned events occurring after the June 1985 suicide attempt.

Husband denied all charges of physical abuse, with a single exception, to-wit: Wife's claim that he slapped her on the cheek in July 1985. Husband's version of that episode was that the boys were in Virginia visiting his parents. While Husband and Wife were out for dinner one evening, Wife was preoccupied with her proposed purchase of a dinner ring for $1,350. Husband opposed the purchase and suggested that her priorities were misplaced considering their family budgeting factors. When they arrived home, Wife went straight to the bedroom, while Husband remained in the living room thinking over their disagreement. Later Husband went to the bedroom "to speak to her about the ring and the priorities and see what I could do for her." He continued his explanation as follows:

A. She was very despondent and depressed and began talking about killing herself and ending it all and wanting to leave the home or go out and wreck the car or something to that effect. And as best as I recall, I was simply sitting on the edge of the bed and she was not talking sensibly and was talking about self destructive activities. I slapped her on her left cheek to say Pat, you can't talk like that. It was more of a loving type slap to—I know I made the statement that you can't talk about or consid-

er taking the mother of our boys away, is basically the way I presented it to her.

Husband testified that he and Wife went to a party at the home of Helen Hart on 30 August 1985. They arrived about 7:00 p.m. By 2:00 a.m. he was tired and told Wife that he was ready to go home. She told him she was not ready and would not go with him. He presented the issue to her every fifteen minutes for the next hour or so with the same results before he informed the hostess about his problem and told her he was leaving. The next morning about 8:00 a.m. he discovered his Wife asleep in the den downstairs. Husband assumed she had stayed at the party until she was brought home. When he learned that Bret Broadwater had brought her home, he thought nothing of that fact.

Wife testified that at the party Husband wanted to leave. When she told him she was not ready to go yet, "all of a sudden he got mad and left." She said she was very upset that he would leave like that and Bret Broadwater offered to take her home. She had been drinking, as had everyone else, and when she got in the car with Broadwater she was "almost hysterical". He took her for coffee, tried to calm her down and then took her home where she went to sleep on the sofa in the downstairs den.

Mrs. Broadwater and Wife were good friends. Both worked for Packer Interior Designs. Mrs. Broadwater testified that she and her husband were at Helen Hart's party on the weekend prior to Labor Day 1985. She tried to persuade her husband to leave from about midnight to 2:30 a.m., at which time she informed him she was going home in their car. Mr. Broadwater was agreeable and walked her to the car and kissed her good-bye. Mrs. Broadwater was not aware of the episode between the Thomassons with respect to Husband leaving without Wife. Mrs. Broadwater testified that Mr. Broadwater came home about 8:30 a.m. the next morning. He told her that Husband had left Wife at the party and she became very upset, was crying and asked him to take her home. When he told her that he did not have a car, a friend

offered his car and Mr. Broadwater took Wife to a restaurant on Murfreesboro Road for breakfast. Mr. Broadwater then took her home and returned to the party. Although Mrs. Hart and her daughter were in bed asleep, Mr. Broadwater cleaned up the kitchen and the patio and then walked home. Mrs. Broadwater estimated the distance from Mrs. Hart's house to their home at seven to nine miles.

Wife testified that on Labor Day morning, 2 September 1985, following the party at Helen Hart's the preceding Friday night, she had just taken a shower, was tired and was lying on the bed when Husband came in and raped her. She alleged in her bill that the parties separated on Labor Day and she testified that that was the last time they had sexual intercourse. She considered she and Husband separated from that date forward, although she admittedly lived in the same house with Husband until 19 November 1985.

Mrs. Broadwater testified that on 3 October 1985, Mr. Broadwater came home and told her that he was going to leave her and asked for a divorce. He did not mention any involvement with another woman. Mrs. Broadwater was very shocked having had no prior warning that their marriage was in any trouble, although she said she recognized that Mr. Broadwater was under stress from his employment as project manager for Rockwell International. Their emotional discussion that followed convinced her that he was determined to seek a divorce. Mrs. Broadwater testified that she felt "the walls closing in on her" and she got in the car and drove to the home of her friend, Mrs. Thomasson, where she informed Mr. and Mrs. Thomasson of Mr. Broadwater's intentions. Mrs. Broadwater and Wife drove to the Packer offices and talked until 1:30 a.m., drinking wine coolers, and discussing Mrs. Broadwater's problem.

The next night, 4 October 1985, about 11:00 p.m. Wife appeared at the Broadwater residence. After visiting with Mrs. Broadwater briefly, during which she was very distant, Wife asked to speak to Mr. Broadwater alone. Mrs. Broadwater went to the other end of the house and later Mr. Broadwater told her he was going to talk to Husband, which Mrs. Broadwater thought was a good idea.

When asked when she realized that there was an involvement between Mr. Broadwater and Wife, Mrs. Broadwater responded that when she learned of Wife's plan to go to Virginia in early November to visit her sister at the same time Mr. Broadwater planned to take a week's vacation to be out-of-town, it was "just too coincidental."

Husband testified that on 4 October Mr. Broadwater called him at home about 12:30 a.m. and asked to come over for talk because "he felt like a stranger in his own home." Mr. Broadwater told Husband that he had been to a lawyer. When Husband told him about his concern that Wife and Mike Joyce were involved in a relationship, Mr. Broadwater proceeded to give Husband advice in regard to alimony, child support and property settlement.

The following Friday night, 7 October, Wife did not come home until Saturday morning. When Husband asked where she had been she said she was not going to divulge that information but that she had been with a very good friend and "had brought that friend to the knowledge of Christ."

The week beginning 14 October, Husband went to the Tri–Cities area, for three or four days. Upon his return, he learned from the boys that Mr. Broadwater had spent two nights in the Thomasson home.

Husband made an appointment with Dr. David Atkinson, a psychologist, for counselling and persuaded Wife to go with him. They went on Saturday of the week following his trip to the Tri–Cities area. After the counselling session they went to a restaurant. During their conversation Husband told Wife that she was not to invite Mr. Broadwater to their home again. Husband testified Wife created a disturbance in the restaurant and informed him that he could not dictate to her who her friends would be.

Wife denied that she had any extra-marital sexual involvement with anyone other than Mike Joyce until 5 November 1985.

She described the affair with Joyce as a very brief one in January and February 1985, although they continued to have a business relationship and were friends. The therapist testified that Mike Joyce's personality was similar to Mr. Thomasson's. When asked which of the two men provided the most significant source of stress to Mrs. Thomasson, the therapist replied that Mike Joyce "was definitely an active stressor in the environment at that time for sure."

Wife also admitted that she met and had drinks with Ray Sam Miller, a builder and contractor, on an unspecified number of occasions and that they "skirted" with a sexual relationship.

On direct examination Wife described the beginning of her romantic relationship with Bret Broadwater as follows:

A. On November the fifth, nineteen eighty-five at the Holiday Inn in Virginia Beach, Bret Broadwater and I totally committed ourselves to one another and we decided that we wanted to spend the rest of our lives together and we consummated that commitment to one another.

Q. Mrs. Thomasson, at what point had your relationship with Mr. Broadwater become a serious romantic relationship?

A. A romantic relationship was a gradual development out of an increasingly— how do I want to say it? Increasingly escalating friendship, and it developed over the period of time from when we actually—when actually—after the divorces, and I am speaking of his, too, and my divorce had been actually determined that there were divorces going to be taking place. During the course of that time it escalated to the point that we realized that on November the fifth, that we did indeed love each other very much and we wanted to be married.

The gradually developing relationship obviously began no later than the night of the party at Helen Hart's and escalated rather rapidly. Approximately one month later, Broadwater informed his wife he wanted a divorce.

Wife testified that although they recognized it was "legal suicide", they decided to tell their respective spouses about their decision out of "concern for the emotional well being" of said spouses. Wife testified that to protect her from violence they asked her therapist Ms. Belsito to invite Husband and Mrs. Broadwater to her office for the announcement of their decision.

Husband testified that Wife left on 1 or 2 November for Richmond, Virginia for "R and R" following her very diligent work with the Parade of Homes in Brentwood. According to Husband she told him she was going to stay by herself in the unoccupied home of her brother-in-law for a week. Husband next heard from her on 8 November requesting that he meet her at the office of her therapist Ms. Belsito. Husband went to the meeting, but Mrs. Broadwater declined the invitation. Ms. Belsito, her associate Dan Elkins, Mr. Broadwater and Wife were also present. Husband testified that after the announcement of Wife's intentions, Ms. Belsito repeatedly wanted to know what he was going to do. Husband sensed that the objective of the meeting was to "push me out of the home and away from the boys." Husband informed them that he was not seeking a divorce. If Wife wanted a divorce, they could live at different ends of the home, but that he was not going to leave until the court told him to leave.

According to Wife, she and Husband returned to their home where they had a talk that escalated into violence. She described it as follows:

A. And at one point—I mean he was abusive, verbally abusive. And at one point, he called me a fornicator and a whore and an adulteress and a bitch. And at that point I was very angry and I turned around and I slapped him in the face. When I did, he grabbed me and I struggled to get away from him and he would not let go of me. And I could not get away from him and I bit him on the arm in an attempt for him to let go of me. And he got even angrier and more violent after I bit him and he literally took me and threw me across the living room floor into the piano.

Q. Did you suffer any visible injuries from that?

A. Yes, I did.

Q. Would you describe it?

A. I had fingerprints on my shoulders, on my arms, where he grabbed me on my forearm. I had bruises across my middle and I had a big bruise across my back in the kidney area and I had some bruises on my leg.

That episode was followed by a violent telephone conversation between Mr. Broadwater and Husband. Later Wife's therapist urged Husband to leave the house and allow Wife to remain and he did so. Husband remained away for a week, but then returned and insisted that he was going to spend the weekend in the home with the children. Wife testified that she left because it was not safe. She returned on Monday and asked Husband to leave, as he had promised according to her, but he refused. Wife testified Husband called her a whore and a fornicator and she threw a plate of food at him. Husband sent the children to a neighbor and began physically removing her from the house. Wife resisted, but was unable to prevent him from dragging her to some steps, which he threw her down, but then "he just stopped." Later that evening Husband handed Wife "his divorce papers" and told her she had to leave. That episode occurred on 19 November 1985, the day that Husband's suit was filed. Husband denied that he called Wife any name other than an adulteress.

Wife moved into the same apartment complex where Mr. Broadwater had taken up residence. Their addresses were 5246 Edmundson Pike and 5250 Edmundson Pike. In March or April 1986 Mr. Broadwater moved into 5246 Edmundson Pike "because of Mrs. Thomasson's need for care as well as our current economic condition," according to Mr. Broadwater.

At the conclusion of the trial, the trial judge made the following comments from the bench:

The only thing that I would say, and I think I am right about the law, because I went and read some of it and kind of got it in my head, there's a series of cases that have to do with adultery committed after the separation. I don't find on this proof that in the sense that separation is used, and the case is that the separation in this case occurred about late in the day on Labor Day 1985, after which time she testified there was no sexual relations between the parties after that. That's uncontradicted. I think that's a separation in the sense the case is contemplated.

In this kind of situation, it seems to me where she's committed adultery after that point, then she has the burden of proving that as of the separation date she could have sued him for divorce right at that point and would have had grounds—could have established grounds for justifying her leaving, breaking up the marriage on grounds of cruel and inhuman treatment. And if she fails on that, then he's entitled to a divorce on the grounds of adultery. So, that's the issue that involves the conflict and that's the approach I take to it.

For some reason we are unable to fathom, the trial judge completely ignored the testimony of Wife that she had committed adultery with Mike Joyce in January or February 1985. The trial judge's memorandum opinion was filed about three weeks after the conclusion of the trial. Therein the trial judge finds she had been a good and faithful wife prior to Labor Day 1985, that the separation took place on Labor Day and that "her subsequent adultery" did not bar her action for divorce on grounds of cruel and inhuman treatment.

It appears quite likely to this Court that Wife was not telling the truth when she testified that she only had sexual intercourse with Mike Joyce on two or three occasions in January or February 1985. Wife's first visit to her therapist, Ms. Belsito, was on 10 June 1985. Among Ms. Belsito's notes in regard to an undated visit, she wrote, "Mike is jerking her strings. She sounds pretty addicted to the relationship." The therapist's notes dated 3 September 1985, the day after Labor Day, reveal that the major part of the session dealt with

Mike Joyce and how she should go about breaking off with him considering "his big ego and vanity." As heretofore stated, Ms. Belsito testified that Mike Joyce was an "active stressor" in Wife's life. Those facts seem to contradict Wife's description of the relationship as "really a very brief affair" that turned into a "very good friendship" after sexual intercourse on two or three occasions in January or February 1985.

However, taking her testimony at face value, she provided proof of Husband's case for divorce on the ground of adultery. The trial judge observed during the course of the trial that Husband's charge of adultery was "conceded" by Wife. As we construe the trial judge's memorandum opinion, after ignoring Wife's adultery with Mike Joyce, he held that Wife's ground for divorce, cruel and inhuman treatment, matured on Labor Day 1985 and her adultery committed with Bret Broadwater after Labor Day was of no factual or legal significance. The Court of Appeals incorporated the trial judge's finding into its opinion and stated that their review of the record revealed that the "evidence fully supports those findings and we adopt them as our own."

■ As noted at the outset of this opinion, neither party filed an answer. At the conclusion of the testimony, counsel for Wife moved the court "to conform the pleadings to the proof which has been presented." The court responded: "All right. So done." Nothing was filed by either party thereafter. All of the statutory defenses to a divorce action listed in T.C.A. § 36–4–112 and T.C.A. § 36–4–120 are affirmative defenses under T.R.C.P. 8.03. T.R.C.P. 8.04 provides that averments in a pleading to which a response is required are admitted, when not denied, except that allegations necessary to sustain a divorce action, among other actions, must be proven. However, no contested divorce case should be tried until the parties have filed answers asserting the defenses they intend to rely on. Nevertheless, we will assume that Wife pled the defense of cruel and inhuman treatment pursuant to T.C.A.

§ 36–4–120 as a preceding and justifiable cause of her adultery and Husband plead the defense of adultery as misconduct justifying his cruel and inhuman treatment of Wife, pursuant to the same statute.

■ Where the courts below completely overlook material undisputed facts, this Court is not bound by the concurrent finding rule. We find that Wife committed adultery with Mike Joyce in January and February of 1985. Under this Court's interpretation of T.C.A. § 36–4–112 [formerly T.C.A. § 36–811] in *Chastain v. Chastain,* 559 S.W.2d 933 (Tenn.1977), the only defenses to adultery pled and proved are the four listed in that section, the principal one being that plaintiff's spouse has also been guilty of adultery. The majority of this Court in *Chastain* also held that the other statute, T.C.A. § 36–4–120 [formerly T.C.A. § 36–818] providing defenses to divorce actions brought on the grounds listed in T.C.A. § 36–4–102 [formerly T.C.A. § 36–802], of which cruel and inhuman treatment is one, is only available when it is alleged and proved that plaintiff was guilty of misconduct that was a justifiable cause and preceded in time, the defendant's misconduct.

■ Misconduct sufficient to provide a bar to plaintiff spouse's right to relief must reach that degree of proof required to establish a ground for divorce if defendant had sought affirmative relief. *See, Akins v. Akins,* 61 Tenn.App. 506, 515, 456 S.W. 2d 354 (1969); *Schwalb v. Schwalb,* 39 Tenn.App. 306, 330, 282 S.W.2d 661 (1955); and *Douglas v. Douglas,* 156 Tenn. 655, 660, 4 S.W.2d 358 (1928).

In *Chastain,* wife sued for divorce on the ground of abandonment and non-support. No defense was interposed by husband and a default judgment was entered against him. At the hearing of the wife's non-contested case, the trial judge learned that wife had a child fathered by a man she had met after husband had abandoned her. The trial judge dismissed wife's suit for divorce *sua sponte* because of the wife's adultery. In *Chastain,* there was no husband present who had alleged and proved adultery as an affirmative ground for di-

vorce. Wife had proved that prior to any misconduct on her part, husband had abandoned her and refused and neglected to provide for her. We held that as a defense, adultery occurring after the ground of abandonment and non-support had matured did not meet the statutory requirement of providing justifiable cause for defendant's abandonment.

■ In the instant case, Husband has alleged and proved adultery occurring prior to the lower court's finding that Wife's ground of cruel and inhuman treatment had matured pursuant to the finding of the lower courts, and later, adultery with another man. As stated, under *Chastain,* the statutory defense of justifiable cause, T.C.A. § 36–4–120, is not available where the ground for divorce is adultery. It is therefore immaterial whether the adultery precedes or follows the defendant's cause of action for cruel and inhuman treatment.

■ While we are of the opinion that many of the findings of the courts below are simply not supported by the record in this case, we conclude that Wife has sustained a cause of action for cruel and inhuman treatment. While it is immaterial to the result of this case, these parties were not "separated" until Wife's announcement on 8 November that she intended to marry another man. A spouse cannot arbitrarily select a separation date that suits his or her convenience or fancy without notice to his or her spouse, and continue sharing the same home, without a compelling reason for doing so. No such reason was advanced here.

The last issue is whether Wife's adultery preceded and provided justifiable cause for Husband's cruel and inhuman treatment, and thus bars her action for divorce under T.C.A. § 36–4–120.

■ The statute requires proof, as well as pleading, that the plaintiff's misconduct was the justifiable cause of defendant's misconduct. Husband simply did not prove that Wife's adultery caused him to commit any of the acts that he committed prior to 8 November 1985. His defense throughout the trial was that he was a caring husband

and did not commit any of the actions upon which Wife relied to prove cruel and inhuman treatment. It would have been difficult for him to do otherwise, since he did not suspect that his wife may have been involved with another man until October 1985 when he found the note that Wife had written to herself as a reminder of Mike Joyce's birthday.

■ The result is that Husband has proven a cause of action for divorce to which Wife is without a valid defense and Wife has proven a cause of action for divorce to which Husband is without a valid defense. In such circumstances the Court cannot award a divorce to either party and their respective suits must be dismissed. *See Brewies v. Brewies,* 27 Tenn.App. 68, 178 S.W.2d 84 (1944) and *Akins v. Akins, supra.*

The facts in *Fox v. Fox,* 676 S.W.2d 956 (Tenn.1984) render it irrelevant to the issues in this case.

■ The record reveals that the parties have deposited $40,000 with the Clerk of this Court, which has been placed at interest pursuant to Court order, representing the net proceeds of the sale of their home. Husband is entitled to be reimbursed for any alimony he has paid, pursuant to the decree of the trial court. If the parties can agree upon that amount, upon filing a stipulation to that effect, the clerk is authorized to charge that sum to Wife's half, assess the costs equally and make disbursement to Husband and Wife accordingly. If the parties cannot agree upon the amount of alimony Husband has paid, the case will be remanded to the trial court for a hearing to ascertain that sum and the trial judge will enter an order and certify same to the Clerk of this Court for disbursement as provided above. Upon disbursement by the Clerk of this Court, the complaints of both parties will be dismissed.

HARBISON, C.J., and COOPER, J., concur in this opinion.

HARBISON, C.J., has filed a separate concurring opinion in which COOPER, J., and the writer of this opinion concur.

DROWOTA, J., has filed a separate opinion wherein he concurs in all except the denial of a divorce to either party and would grant a divorce to both parties.

O'BRIEN, J., concurs with DROWOTA, J.

HARBISON, Chief Justice, concurring.

I concur in the opinion prepared for the Court by Justice Fones. The dissenting opinion is thoughtful and the result suggested is appealing. However, I do not believe that that result is justified under the present statutes on the subject of divorce.

The case of *Brewies v. Brewies*, 27 Tenn. App. 68, 178 S.W.2d 84 (1943) did not rest upon the alimony statutes existing at that time, but upon the divorce statutes which were then in force and which remain so at the present time.

In the *Brewies* case, each party was found to have established grounds for divorce. The Court made reference to the statute dealing with decrees in divorce cases, which was then code § 8444 and is presently codified as T.C.A. § 36–4–120(a) as follows:

> If the cause assigned for a divorce be any of those specified in § 36–4–102, the defendant may make defense by alleging and proving the ill conduct of the complainant as a justifiable cause for the conduct complained of, and on making out the defense to the satisfaction of the court, the bill may be dismissed with or without costs, in the discretion of the court.

In the *Brewies* case the Court said:

> This decree is self emasculating and cannot stand.

> How can it be said that she was guilty of such cruel and inhuman treatment of him as would authorize a severance of the marital ties, and in the same breath say that he 'walked out on cross plaintiff and refused to longer live with her' (which we believe was intended to charge desertion) so as to authorize her to receive a divorce? Each was in fault, each was without fault, according to the decree. 27 Tenn.App. at 71, 178 S.W.2d at 85.

As stated, the opinion of the Court in that case did not in any way depend upon the alimony and support statutes. Admittedly, these have been extensively amended since the *Brewies* case was decided, but the statutes dealing with the grounds for divorce have not, except for the adding of some grounds not based upon fault, such as irreconcilable differences and separation for three consecutive years.

The General Assembly is presumed to know the construction and interpretation of statutes by the courts. *See Hamby v. McDaniel*, 559 S.W.2d 774, 776 (Tenn.1977). The General Assembly has met repeatedly since the *Brewies* case was decided, and it has not changed the basic provisions of the fault-based statutes.

Rightly or wrongly, the divorce code, except for the statutes based on irreconcilable differences or absence for three years, consists of grounds comprising fault or misconduct. The divorce proceeding, again rightly or wrongly, is basically adversarial, being instituted by a sworn petition in which collusion must be denied. T.C.A. § 36–4–107. A jury trial may be demanded. T.C.A. § 36–4–113. Proof is required even when the allegations of the complaint are confessed, except for cases of irreconcilable differences. T.C.A. § 36–4–114. That section provides as follows:

> If the defendant admits the facts charged in the bill or petition and relied upon for the ground for a divorce, or the bill be taken for confessed, the court shall, nevertheless, before decreeing a divorce, except a divorce on the ground of irreconcilable differences, hear proof of the facts alleged as aforesaid, and either dismiss the bill or petition or grant a divorce, as the justice of the case may require.

T.C.A. § 36–4–119 provides:

If, upon hearing the cause, the court is satisfied that the complainant is entitled to relief, it may be granted either by pronouncing the marriage void from the beginning, or by dissolving it forever and freeing each party from the obligations thereof, or by a separation for a limited time.

Obviously, there could be no valid distinction between a "complainant" and a counter-claimant. If both are entitled to a divorce under these fault-based statutes then, in my opinion, the law has been and remains that neither is entitled to obtain a divorce.

This result may not be socially appealing, as suggested by the dissent. Nevertheless, in my opinion, well-settled construction of established statutes should not be changed simply because of that fact.

If the General Assembly of the state wishes to adopt the principle of dual divorce, it may do so by amending existing statutes. Unless and until it does so, however, in my opinion the established interpretation of the statutes should be retained.

The parties in the present case are not without remedy, and their situation does not seem to me to justify reinterpretation of the divorce code merely because statutes dealing with division of property, alimony and support have been altered. These statutes are codified in different chapters from the provisions on grounds for divorce. It is apparent that when the ground of irreconcilable differences was added to the divorce code, the General Assembly went through that code carefully, specifically providing for proceedings under that ground. At the same time it left intact the grounds and procedures for fault-based proceedings. I do not believe that it intended, by amending the alimony and property division statutes, to change the provisions or the previous interpretations of the older divorce statutes.

DROWOTA, Justice, dissenting.

I respectfully dissent. Both parties having made out grounds for divorce, and neither party having made out a defense, I would grant the divorce to both parties.

## I.

Under prior case law, when both parties proved grounds for divorce, neither party was entitled to a divorce. *Brewies v. Brewies*, 27 Tenn.App. 68, 178 S.W.2d 84 (1943). Divorce was seen as "a remedy for the innocent against the guilty; hence, if both parties are equally at fault, a divorce will not be granted." *Id.* 27 Tenn.App. at 72, 178 S.W.2d at 85. See also *Brown v. Brown*, 198 Tenn. 600, 281 S.W.2d 492 (1955); *Canning v. Canning*, 59 Tenn.App. 678, 443 S.W.2d 502 (1968); *Schwalb v. Schwalb*, 39 Tenn.App. 306, 282 S.W.2d 661 (1955).

As a practical matter, the courts recognized that some fault often, if not always, attached to the conduct of the prevailing spouse.

It is a matter of common knowledge among the members of the Bench and Bar that divorces are properly granted in many cases where the petitioning spouse may, to some extent, be in fault, yet the misconduct of the defendant spouse is so overwhelmingly disproportionate to that of the petitioning spouse as to constitute grounds for granting the petitioning spouse a divorce. *This is properly done where the alleged and proven acts of misconduct on the part of the petitioning spouse are not such as to entitle the defendant spouse to a divorce or to constitute a defense to the action because of recrimination.*

*Akins v. Akins*, 61 Tenn.App. 506, 456 S.W.2d 354, 358 (1969) (emphasis supplied). As the emphasized language indicates, however, the fault of the prevailing spouse could not reach the level by itself to constitute grounds for divorce or a defense of recrimination.

In recent years and since the development of the body of case law just discussed, the divorce and alimony statutes have undergone substantial change. In 1977, the General Assembly provided for divorce based on grounds of irreconcilable differences, without regard to fault. Pub-

lic Acts of 1977, ch. 107, § 1 (T.C.A. § 36–4–103). In 1985, the General Assembly added an additional ground for divorce for parties, without minor children, who had lived in separate residences without cohabiting as husband and wife for a continuous period of three or more years. Public Acts of 1985, ch. 178, § 1 (T.C.A. § 36–4–101(12)).

These statutory changes represent a significant shift from the earlier policy of the state characterizing divorce as a remedy for the innocent against the guilty. For persons proceeding under these grounds, fault is simply not at issue.

Another important statutory change occurred with the 1983 repeal of T.C.A. § 36–826 and its replacement by § 36–820(d) [now § 36–5–101(d)]. Public Acts of 1983, ch. 414, § 1. Section 36–826 (1955 Code) provided:

> **36–826. Relinquishment of right to alimony, dower or share in husband's property if husband obtains divorce.—** If the bonds of matrimony be dissolved at the suit of the husband, the defendant shall not be entitled to dower in the complainant's real estate, nor to any part of his personal estate, in case of his intestacy, nor to alimony.

In order to understand this statute, we must look briefly at how it functioned within its legal and social background. Further, its explicit gender discrimination cannot go without some comment.

Alimony was allowed the wife in recognition of the husband's common law liability to support her. *Brandon v. Brandon,* 175 Tenn. 463, 465, 135 S.W.2d 929 (1940); *McClung v. McClung,* 29 Tenn.App. 580, 198 S.W.2d 820, 822 (1946). There was (and is) no necessary connection between alimony and divorce; alimony can be awarded whether or not divorce is granted. *Williams v. Williams,* 146 Tenn. 38, 236 S.W. 938 (1922); T.C.A. § 36–5–101. Only the wife could receive alimony, the statute making no provision to decree alimony for a husband entitled to a divorce. T.C.A. § 36–820 (1955 Code); *Brown v. Brown,* 160 Tenn. 685, 28 S.W.2d 350 (1930). Under § 36–826, if the husband prevailed in a

divorce action, his obligation to support and maintain the wife was at an end.

In *Brown v. Brown,* 198 Tenn. 600, 281 S.W.2d 492 (1955), this Court discussed § 36–826 as follows:

> The policy underlying this provision is apparent. Divorce in this state is not a matter to be worked out for the mutual accommodation of the parties in whatever manner they may desire, or in whatever manner the Court may deem to be fair and just under the circumstances. It is conceived as a remedy for the innocent against the guilty. *Brewies v. Brewies,* 27 Tenn.App. 68, 178 S.W.2d 84. The unfortunate person against whom a divorce is granted may suffer not only the severance of his or her marital relations, but also the deprivation of those rights, such as alimony, which arise out of the marital relation. These provisions thus are intended to further the policy of rewarding the innocent and punishing the guilty. *Allen v. McCullough,* 49 Tenn. 174, 188.

198 Tenn. at 613, 281 S.W.2d at 498. We thus explicitly linked this statute with the overall policy that divorce is a remedy for the innocent against the guilty.

I will discuss below the constitutional infirmities of the gender-based classification. It is important for now to recognize the practical effect of the operation of § 36–826. The denial of alimony was certainly perceived, and not without reason, as entailing serious consequences for the wife. I am not suggesting that women have now reached full equality with men in employment and economic opportunity; however, the opportunities for a divorced woman to support and maintain herself were much more restricted when *Brewies* and its progeny were decided, than they are now, 45 years later. Had the courts held, contrary to *Brewies,* that both parties were entitled to divorce, the operation of the statute would have precluded alimony.

In *Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), the U.S. Supreme Court held that Alabama alimony statutes providing that husbands, but not wives, may be required to pay alimony

violated the 14th Amendment equal protection clause. Among the asserted justifications for the statutes were (1) that they provided help for needy spouses, using sex as a proxy for need, and (2) that they compensated for past discrimination which had left women unprepared for the working world following divorce. 99 S.Ct. at 1112. The Court accepted the importance both of assisting needy spouses and reducing the economic disparity between men and women resulting from the discrimination against the latter. It rejected the statutes, however, because the gender-based classification was not substantially related to these objectives, and in fact was gratuitous and unnecessary to the achievement of the legitimate objectives. *Id.* 99 S.Ct. at 1112–1113.

As a consequence of *Orr*, the General Assembly amended the Tennessee alimony statutes, including § 36–826 to make them gender neutral. Public Acts of 1979, ch. 339. As amended, § 36–826 provided:

**36–826. Relinquishment of defendant spouse's interest in plaintiff's estate and right to alimony.**—If the bonds of matrimony be dissolved at the suit of the plaintiff spouse the defendant spouse shall not be entitled to any part of the real or personal estate of the plaintiff spouse, in case of such plaintiff's intestacy nor to alimony. However, when the cause of divorce is irreconcilable differences under § 36–801, the foregoing provision shall not apply if the parties have entered into a written property settlement agreement wherein the plaintiff consents to the payment to the defendant of alimony, either in a lump sum form or periodic payments; provided, that such property settlement is approved by the court granting the decree of divorce.

In *Mitchell v. Mitchell*, 594 S.W.2d 699 (Tenn.1980), this Court following *Orr*, held unconstitutional the pre–1979 Tennessee alimony statutes insofar as they contained gender-based classifications. (It should be noted that the Alabama statutes in *Orr*

permitted the wife to recover alimony even if the husband received the divorce.)

Under § 36–826, as amended in 1979, it remained important for alimony purposes which party received the divorce.[1] As previously mentioned, however, in 1983 § 36–826 was repealed. In its stead is the provision now codified at § 36–5–101(d):

(d) It is the intent of the general assembly that whenever appropriate an order for payment of support and maintenance shall be rehabilitative and temporary. In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

.　　.　　.　　.　　.

(10) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so....

While fault remains a factor in determining alimony, a guilty spouse is not automatically precluded from alimony. Moreover, by referring to "relative" fault, the statute implicitly recognizes that fault can lie with both parties, and indeed that fault could be equal. Seldom in contested divorce cases is the blame for the failure of a marriage placed wholly upon one spouse. It is rare that a spouse is "innocent" or without fault to some degree and frequently the difference in degree of fault is minimal.

**II.**

It is true that no statute explicitly permits a dual divorce. Nor does anything in the statutes expressly preclude a court, under circumstances present in the instant case, from granting both parties a divorce. We are left, as were the courts at the time of *Brewies* and its progeny, with the task of determining the policy of the state on this question, a policy found certainly in prior judicial decisions, but also and primarily in the statutes themselves.

**1.** In *Brewies v. Brewies, supra,* the trial court awarded each a divorce from the other and the wife was given alimony. The husband argued that a decree giving the wife a divorce and

alimony is void because a divorce had also been granted the husband. The trial court was reversed.

"The public policy of a state is to be found in its constitution, its statutes, and the decisions of its courts. Primarily it is for the legislature to determine the public policy of the state, and if there is a statute that addresses the subject in question, the policy reflected therein must prevail."

*Hyde v. Hyde*, 562 S.W.2d 194, 196 (Tenn. 1978).

The revisions of our divorce and alimony statutes have in my view worked a change in the public policy of this state regarding divorce. Divorce can no longer be understood solely as a remedy for the innocent spouse against the guilty spouse. This is not to say that fault is irrelevant. Fault-based grounds, such as the ones at issue in the instant case, obviously remain, as well as fault-based defenses. See, e.g., T.C.A. §§ 36–4–112, 36–4–120. And fault is one factor among many in determining alimony.

It is to say, rather, that the policy that a party must be without fault before he or she is entitled to a divorce no longer can be found in our divorce statutes. It cannot be reconciled with statutes permitting divorce without proof of fault or assumption of innocence. It cannot be reconciled with statutes that provide for alimony based, *inter alia*, on relative fault.

This Court has already recognized the public policy at issue in this case.

There is, however, another public policy consideration that is applicable in the aftermath of a hopelessly broken marriage, that was enunciated by this Court many years ago, a policy that also undergirds the legislative enactment allowing divorce on the ground of irreconcilable differences. In *Farrar v. Farrar*, 553 S.W. 2d 741 (Tenn.1977), Mr. Justice Henry, writing for the Court said: "We fully recognize that considerations of public policy demand that the institution of marriage be sheltered and safeguarded. But there is an obverse side to the coin of public policy and consideration must be given to the fact that society is ill-served by a legally commanded continuance of a marriage which exists in name

only. We quote from the opinion of the late Chief Justice Grafton Green, in *Lingner v. Lingner*, 165 Tenn. 525, 534, 56 S.W.2d 749, 752 (1933): As pointed out by another court, we must take into consideration 'the mischiefs arising from turning out into the world, in enforced celibacy, persons who are neither married nor unmarried.' (Citation omitted.) Society is not interested in perpetuating a status out of which no good can come and from which harm may result." 553 S.W.2d at 744, 745.

*Hyde v. Hyde*, 562 S.W.2d 194, 197–98 (1978). With the provision of alimony on a relative fault basis in 1983, this public policy has come, as it were, to full bloom.

A divorce is not granted to one spouse but denied to the other. A divorce dissolves a marriage, and frees both spouses equally. There simply is no such thing as divorcing one spouse but not the other.

I would overrule *Brewies* and the cases following it, but not because they were erroneously decided. To the contrary, those decisions were wholly consistent with and complementary of the statutes then in effect. But for the reasons I have discussed, the policy expressed in those decisions is no longer a good reason for denying both parties a divorce when both have proved grounds and neither has proved a defense.

It is apparent that this marriage is beyond the point of reconciliation and to require the parties to remain married, in name only as the majority opinion suggests, serves no useful purpose. Both parties sought a divorce and I feel substantial justice would not be accomplished by denying them a divorce.

Accordingly, I would grant both parties the divorce and remand the case to the trial court for a determination of alimony, if any, and the division of the parties' marital property. I am authorized to state that Justice O'BRIEN concurs in this dissenting opinion.