W. EUGENE DAVIS, Circuit Judge,
dissenting:
I disagree with the majority’s conclusion that the plaintiffs have no standing to bring their First Amendment challenge to Louisiana’s Choose Life statute. I therefore dissent.
I.
The majority holds that plaintiff Keeler lacks standing to challenge La. R.S. 47:463.61 because, even if the Choose Life statute is declared unconstitutional, Keel-er’s complained of injury would not be redressed because that remedy will not provide Keeler with a forum in which to express her opposing pro-choice viewpoint. In the majority’s view, the requested relief would merely function to prevent other motor vehicle drivers from expressing their choose-life point of view.
I would define Keeler’s injury in a different manner. The plaintiffs alleged that their rights under the First and Fourteenth Amendments have been violated because the Louisiana Legislature, as part of its specialty license plate program, has enacted the Choose Life statute. This statute allows for expression of the choose life message on state prestige license plates, without allowing for the expression of the opposing pro-choice viewpoint in that same forum. The plaintiffs allege and the State concedes that Louisiana is an anti-abortion state which allows the fact-finder to infer that the Louisiana Legislature will not pass a statute authorizing the expression of a choose choice message.[1] The plaintiffs have alleged and the district court found that the State has engaged in viewpoint discrimination by authorizing the Choose Life license plate. As a result, plaintiffs are not and will not be given the opportunity to speak their opposing viewpoint in that same forum. In other words, the plaintiffs are injured by the government’s promotion of one side of the debate on the abortion rights issue in a speech forum, coupled with the lack of opportunity to present their opposing view. “[U]n-der the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an ‘equality of status in the field of ideas,’ and government must *388 afford all points of view an equal opportur nity to be heard.”[2]
II.
As the plaintiffs have alleged an injury raising First Amendment concerns, this court may properly apply an expanded notion of standing to determine who may institute a suit for relief.[3] The majority opinion addresses standing utilizing the traditional requirements of injury-in-fact, causation and redressability. Although as discussed below, I would find that plaintiff Keeler satisfies all requirements, that analysis may not be applicable to this case. In Lakewood v. Plain Dealer Pub. Co., the Supreme Court stated specifically,
Recognizing the explicit protection afforded speech and the press in the text of the First Amendment, our cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for and being denied, a license.[4]
In that case, a city ordinance gave the mayor unfettered discretion to grant or deny a permit for placing newspaper dispensing devices on public property. The plaintiff newspaper did not apply for a permit but brought suit to challenge the news rack ordinance. On the issue of standing, the Supreme Court, with no mention of the three requirements listed above, held that the newspaper could bring a facial challenge to the statute without applying for a permit because the requirement of an annual permit is potentially threatening to speech, the license is aimed at expressive conduct and the licensing system threatens freedom of expression because it creates a system by which speech is reviewed without standards.[5] Without standards, speakers denied a license will have no way to prove that a decision against their application was unconstitutionally motivated. Such uncertainty can compel self-censorship when speakers conform their speech to the li-censor’s preferences.[6] Generally, a facial challenge to a licensing law lies where the law gives a government official or agency substantial power to discriminate based on content or viewpoint of speech by suppressing disfavored speech or speakers and the law has a close nexus to expression.[7]
Although cases under this precedent generally deal with situations in which a single government official is given the discretion under the statute to grant or deny a license affecting expressive activity, I see no reason why the principle should not be applied to this case.[8] Both parties *389 agree that the messages on prestige license plates are speech. Louisiana’s ad hoc legislative process for granting or denying authorization for prestige license plates is analogous to a licensing process to obtain access to expressive activity. The process gives the Louisiana Legislature similar unbridled discretion over messages on prestige license plates, which discretion is limited only by the size of the plate itself. Clearly if the decision to authorize specialty plates were being made by a government official or commission under authority delegated by the legislature, the actions of the official or commission would be subject to judicial review. Leaving that authority directly in the hands of the Louisiana legislature should not change the analysis.[9]
The fact that there is no single statute establishing Louisiana’s specialty license plate program does not affect our analysis.[10] In Niemotko v. Maryland, no ordinance or statute was in place regulating or prohibiting the use of the park.[11] Rather, a practice had developed vesting authority to grant permits for the use of the park in the Park Commissioner and the City Council. The court stated, “[n]o standards appear anywhere; no narrowly drawn limitations; no circumscribing of this absolute power; no substantial interest of the community to be served. It is clear that all that has been said about the invalidity of such limitless discretion must be equally applicable here.”[12] Accordingly, the lack of a statute establishing the specialty license plate program should not prevent the plaintiffs from bringing a facial challenge to the State’s system for authorizing specialty license plates.
The Choose Life statute is just one application of a policy adopted by the Louisiana legislature to authorize specialty *390 plates on an ad hoc basis. It is clear that attacks against an unwritten policy or practice regarding the issuance of licenses for speech are subject to the same constitutional analysis as an attack on a statute or ordinance and should fall within the same standing analysis set forth in Lakewood. In summary, at its core I view this case as indistinguishable from the decision in Lakewood on the issue of standing. Further, I see no principled reason why plaintiffs raising free speech claims in this case do not have standing to attack the Choose Life statute as a discrete application of Louisiana’s policy regarding authorization of specialty license plates. This is the single statute under this program that offends them and I see no reason to require them to challenge.the entire specialty license plate program.
III.
Plaintiff Keeler also has standing using the traditional analysis outlined by the majority opinion. Plaintiff Keeler’s injury is personal, not a generalized grievance, based on the allegation that she would purchase a prestige license plate expressing her pro-choice views but is unable to do so. Based on these allegations, the harm is fairly traceable to, and the direct result of, the State’s conduct. Also, the alleged harm is likely to be redressed by the requested relief. The relief requested is that the court enjoin the implementation of the Choose Life statute and declare it unconstitutional. While this relief will not allow plaintiffs to speak in the specialty license plate forum, it will have the effect of preventing the State from manipulating the content of public debate by presenting only the view favored by the state.
A plaintiff has standing to seek relief in a case such as this when she is aggrieved by a statute, like the Choose Life legislation, that is underinclusive. A person or group excluded from benefits conveyed via an underinclusive statute has standing to challenge the statute on constitutional grounds. This is so even if the effect of striking down the statute is to deny the benefit to the intended group and not extend it to the plaintiffs. For example, in Orr v. Orr, a man who had been ordered to pay alimony to his wife under state laws providing that husbands, but not wives, may be required to pay alimony upon divorce, had standing to challenge the constitutionality, on equal protection grounds, of such alimony laws, notwithstanding that the man made no claim of being entitled to an award of alimony from his divorced wife but challenged only the unequal status of husbands and wives as to the burden of alimony.[13]
The Supreme Court applied this concept to a free speech claim in Arkansas Writers’ Project, Inc. v. Ragland.[14], In Rag-land, the state of Arkansas imposed its personal property tax on receipts from sales of general interest magazines, but exempted receipts derived from the sale of newspapers and religious, professional, trade and sports journals. The publisher of the Arkansas Times, a general interest magazine, contested the assessment of taxes against it on the basis that subjecting the Arkansas Times to the sales tax, while sales of newspapers and other magazines were exempt, violated the First and Fourteenth Amendments. The Arkansas Times is a magazine that includes articles on a variety of subjects, including religion and sports, but which does not qualify for one of the topic based exemptions.
*391 Taking a position similar to that expressed by the majority opinion, the Commissioner of Revenue of Arkansas argued to the Supreme Court that the Arkansas Times did not have standing to challenge the Arkansas sales tax. The Commissioner contended that since the appellant conceded that the Arkansas Times is not a newspaper or religious or sports journal, it had not asserted an injury that could be redressed by a favorable decision of the court. The Commissioner’s argument built on the conclusion of the Arkansas Supreme Court that “[I]t would avail [appellant] nothing if it wins its argument ... It is immaterial that an exemption in favor of some other taxpayer may be invalid, as discriminatory. If so, it is the exemption that would fail, not the tax against the [Arkansas] Times. ... [Ragland v. Arkansas Writers’ Project, Inc., 287 Ark. 155] 698 S.W.2d [802], at 803 [(1985)].”[15] The Supreme Court rejected this argument, stating that such a position “would effectively insulate underinclusive statutes from constitutional challenge, a proposition we soundly rejected in Orr v. Orr, 440 U.S. 268, 272, 99 S.Ct. 1102, 1108, 59 L.Ed.2d 306 (1979).” The fact that a decision in favor of the plaintiff would not result in the sales tax exemption being extended to all publications and would do nothing more than remove the benefit of the exemption from other speakers did not prevent a finding that the appellants had standing. The Court viewed the discriminatory exemption granted to others as a burden on the plaintiffs. The plaintiffs “constitutional attack holds the only promise of escape from the burden that derives from the challenged statut[e].”[16]
The plaintiffs in today’s case presents a similar, and even stronger, case for standing. The Choose Life statute, like the sales tax exemption in Ragland, grants a privilege related to speech to a select group. In our case, the privilege was granted based on the state’s support of the viewpoint expressed in the Choose Life license plate. (There does not appear to be viewpoint discrimination in Ragland.) Keeler’s standing to bring her claims does not depend on whether the lawsuit seeks to obtain the benefit for herself. It is sufficient, based on Ragland, that Keeler seeks to remove the discriminatory benefit favoring others in a speech context. In other words, the State’s manipulation of the playing field for speech by the authorization of the Choose Life license plate, like the tax exemption in Ragland, is a burden on the free speech rights of Keeler. Removal of that discriminatory program will redress Keeler’s alleged injury. Just as it was immaterial in Ragland that the effect of declaring the challenged tax exemption invalid might increase the taxes applicable to some publications (possibly creating a burden on speech rights), it is immaterial that a declaratory judgment in Keeler’s favor might also have the effect of removing the benefit granted to those who wish to display the Choose Life plate.
Further, the outcome of this litigation need not result in the authorization of a Choose Choice license plate. As was the case in Ragland and Orr, plaintiff Keeler may prevail in her quest to declare the Choose Life license plate statute unconstitutional and not achieve authorization from the Louisiana legislature for a Choose Choice license plate.[17] It is sufficient that the plaintiff seek, as does Plaintiff Keeler, to simply remove the discriminatory benefit granted to others and thereby create a *392 level playing field for all affected by the statute. Keeler has alleged a sufficiently personal stake in the outcome of this litigation and this constitutional attack holds the only promise of escape from the burden on her free speech rights that derives from the challenged statute.[18]
IV.
In summary, I would find that plaintiff Keeler has standing to assert her First Amendment claims. Under relaxed standing principles recognized in First Amendment cases, she has standing to bring a facial challenge to the Choose Life statute. This statute is an application of Louisiana’s system of permitting the state legislature to authorize specialty license plates without standards or constraints, which in this instance promotes state sponsored viewpoint discrimination. In addition, applying traditional standing analysis, I would hold that Plaintiff Keeler has established a personal injury fairly traceable to the defendant’s allegedly unlawful conduct that is likely to be redressed by the requested relief.
In this case, the state sponsored the viewpoint of a select group. This burdened those holding a contrary view who were unable to express their views in the state sponsored forum. As in Ragland, plaintiffs “constitutional attacks holds the only promise of escape from the burden that derives from the challenged statute.” Stated differently, the majority’s unduly narrow application of standing principles to this First Amendment case precludes any plaintiff from attacking the constitutionality of the Choose Life statute.
Because the majority dismissed this case for lack of standing, the court does not reach the merits of the preliminary injunction. For reasons stated above, I would find that plaintiff Keeler has standing and, on the merits, I would affirm the district court’s preliminary injunction, essentially for the reasons stated by the district court and remand for entry of a permanent injunction against the implementation of LA. R.S. 47:463.61.

. This has been made abundantly clear since this appeal was filed. After the initial briefs were filed in this case, an amendment to the Choose Life legislation was introduced in the last session of the Louisiana Legislature, that, if passed, would have authorized a “Choose Choice” license plate. The amendment was rejected.

. Police Dep’t of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972)(Emphasis added)(internal citations omitted).

. Moore’s Federal Practice 3d, § 101.61 [5][a].

. Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 755-56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988).

. Id. at 2145-46.

. Id. at 2145.

. Id.

. Freedman v. Maryland, 380 U.S. 51, 56, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license ") (emphasis added); Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (in the First Amendment context, "[o]ne who might have had a license for the asking may ... caE into question the whole scheme of licensing when he is prosecuted for *389 failure to procure it”). See also Shuttlesworth v. Birmingham, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (" 'The Constitution can hardly be thought to deny to one subjected to the restraints of [a licensing law] the right to attack its constitutionality, because he has not yielded to its demands’ ” (quoting Jones v. Opelika, 316 U.S. 584, 602, 62 S.Ct. 1231, 86 L.Ed. 1691 (1942) (Stone, C. J., dissenting), adopted per curiam on rehearing, 319 U.S. 103, 104, 63 S.Ct. 890, 87 L.Ed. 1290 (1943))); Lovell v. Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) ("As the ordinance [providing for unbridled licensing discretion] is void on its face, it was not necessary for appellant to seek a permit under it”).

.In Shuttlesworth v. Birmingham, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), parade permits were issued by the Commission, the city’s legislative branch. In that case the ordinance conferred upon the City Commission the power to prohibit any "parade,” "procession,” or "demonstration” on the city’s streets or public ways. In deciding whether or not to withhold a permit, the members of the Commission were to be guided only by their own ideas of "public welfare, peace, safely, health, decency, good order, morals or convenience.” The Supreme Court decided that this ordinance as it was written, fell squarely within the ambit of many decisions of the Court holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional.

. La.R.S. 47:463.A.(3) is not such a statute. It merely states that specialty license plates authorized by the legislature "shall contain the uniform alpha-numeric series accompanied by a symbol or emblem representing the organization requesting such a plate.” The statute also contains the requirement that plates issued after August 15, 1999 shall include a handling charge of $3.50 and that no plate shall be established after January 1, 2002 until the department has received a minimum of one thousand applications for the plate.

. 340 U.S. 268, 272, 71 S.Ct. 325, 95 L.Ed. 267 (1951).

. Id.

. 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979).

. 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987).

. Id. at 1726.

. Ragland at 227, 107 S.Ct. 1722, quoting Orr v. Orr at 273, 99 S.Ct. 1102.

. Orr at 273, 99 S.Ct. 1102, Ragland at 1726-27.

. Id.